ANNA C. THOMPSON *v.* STANDARD WHOLESALE
PHOSPHATE & ACID WORKS, INC., ET AL.

[No. 26, April Term, 1940.]

306

*Decided May 23rd, 1940.*

The cause was argued before OFFUTT, PARKE, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Paul Berman,* with whom were *Theodore B. Berman* and *David L. Elliott* on the brief, for the appellant.

*William D. Macmillan* and *Rignal W. Baldwin, Jr.,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellees.

MITCHELL, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Superior Court of Baltimore City, on the verdict of a jury, reversing a decision of the State Industrial Accident Com-

mission, under which the claimant, Anna C. Thompson, was allowed compensation by reason of the death of her husband.

The appellant on March 27th, 1937, filed her claim with the State Industrial Accident Commission alleging that her husband, John C. Thompson, died on March 7th, 1937, as a result of an injury sustained by him on May 2nd, 1936, arising out of and in the course of his employment with Standard Wholesale Phosphate & Acid Works, Inc., employer, the insurer of the employer being Liberty Mutual Insurance Company.

The hearing was held by the commission on July 11th, 1939, and the order allowing compensation passed on July 25th, 1939. From that order an appeal was taken to the Superior Court of Baltimore City, and there submitted to the jury upon issues as follows:

(1) Whether the deceased employee sustained an accidental injury arising out of and in the course of his employment by the employer?

(2) Was the death of the employee the result of an accidental injury arising out of and in the course of his said employment?

As to the first issue the jury answered "yes," and to the second their answer was "no".

The testimony tends to show that the deceased husband of the appellant, for several years prior to the date of his alleged injury, was employed as a butcher, engaged in skinning horses and dogs, cooking the carcasses of the animals, and preserving their hides. He worked in what was known as the "horse house," and on May 2nd, 1936, while descending a ladder, it slipped, causing him to fall and injure his right side at the end of his ribs. The testimony also tends to show that the ladder was from six to eight feet long, and was not stationary; that the distance which the deceased fell was from eighteen inches to half the length of the ladder; but whether he struck a radiator or the ground in the course of his fall, the testimony is conflicting. Apparently but one witness was with the employee at the time of the acci-

dent, and later he was found sitting on a bench holding his right side, it being at that time that he gave the above narrative as to the cause of his injury. Ten or fifteen minutes after the accident the injured employee was sent by the superintendent of his employer to Mercy Hospital, in Baltimore City, where he was seen by Dr. Wise, who had previously had indirect professional contact with the employee. Dr. Wise examined him and he detailed to the doctor the manner in which the accident happened, as shown by the hospital records, explaining that he was at the time half way up a seven foot ladder; that it slipped on some grease, causing it to fall suddenly, and that he fell, hitting the upper part of his abdomen against a radiator.

The health record of the deceased prior to the occasion of his accident tends to show that on January 11th, 1936, he suffered an ailment which was diagnosed at Mercy Hospital as chronic bronchitis; on March 19th, at the same institution, a diagnosis showed chronic bronchitis and chronic myocarditis. On March 21st, 1936, he was admitted to the above hospital and received treatment until April 4th, 1936, when he was discharged. He returned to work and worked until May 2nd, 1936, the date of the accident, when he was again admitted to the hospital, treated, and discharged sixteen days later. On May 21st, he again assumed his duties at the phosphate and acid plant, working there with but slight loss of time, other than legal holidays, until January 8th, 1937, when he was first admitted to Franklin Square Hospital, from which latter institution he was discharged on January 21st, 1937; thereafter, on February 1st, 1937, resuming his work and pursuing the same with but slight loss of time, except holidays, until February 28th, 1937, when he re-entered Franklin Square Hospital and was there treated until the date of his death.

During the course of his successive treatments in the two hospitals, Mr. Thompson came in contact with at least six doctors who were connected, respectively, with

said institutions, and who testified as experts, as well as from their own personal knowledge of the physical condition of the deceased employee, upon the respective occasions on which they treated him or made observations of his case.

Of the numerous ones reserved, exceptions by the appellant during the course of the examination of said doctors forms the basis of nearly all of said exceptions. Other exceptions found in the record, however, relate to other evidence adduced at the trial, and in addition to these, exceptions were, respectively, reserved to the rulings of the trial court upon the prayers, and to its action in permitting one of counsel for the appellees, in his closing argument, to inform the jury that the State Industrial Accident Commission, in reaching its decision, did not have before it the opinions of Drs. Smith and Peters, to the effect that there was no causal connection between the death and the accidental injury of the employee.

Henry C. Fritz, assistant superintendent of the employer, testified as to the indicated character of the work in which Thompson was engaged. Mr. Fritz recalled the occurrence of May 2nd, 1936, stating that Thompson claimed to have fallen from a ladder about noon; the witness had a talk with Thompson, who stated "that he was coming down this ladder and slipped and fell and struck his right side at the end of the ribs, against the radiator." A photograph, showing the horse plant in which Thompson worked and the position of the ladder and radiator as of the date of the accident, was admitted in evidence, and the witness stated that Thompson claimed "the ladder slipped and threw him." Work cards from which the witness testified tended to show that Thompson returned to work on May 21st, 1936, worked practically full time, legal holidays excepted, until January 8th, 1937, when he went to Franklin Square Hospital, returning to work on February 1st, 1937, and made like time until February 28th, 1937, the date on which he entered Franklin Square Hospital the second and last

time. And the witness stated that April 13th, 1936, was the first day on which Thompson worked subsequent to April 4th, 1936, when he was discharged from Mercy Hospital; that the duties of the witness brought him past the horse plant maybe two or three times a day and that, on the occasions when Thompson was working, he was doing his work as usual.

Caleb Pinkine, foreman in the plant, testified that Thompson first went to Mercy Hospital on January 11th, 1936; he then complained of "pains in his stomach like it was gas"; when he returned he reported that his trouble was bronchitis, he had a bottle of medicine and worked the balance of that day; that he returned to Mercy Hospital March 19th, 1936, and came back to work April 13th, 1936; that he worked from then on to the date of the accident. On that date he explained that at about 12:30 P. M. he was advised by another employee of the plant that Thompson "had slipped and fell down a ladder"; that he went to the horse factory to see what had happened and saw Thompson sitting on a bench "complaining he hurt his side, * * * he said he slipped on the iron ladder"; that he claimed he fell off the second rung of the ladder, a measured distance of eighteen inches from the ground; he was holding his right side; but "would not show us anything, any injuries. I asked him, but he never showed us." Further testifying, the witness stated that Thompson said he struck the "L or elbow on the radiator" as he was descending the ladder face forward; that William Lewis, the only eye witness to the accident, was then dead; that Thompson was sent to Mercy Hospital the date of the accident, released therefrom May 18th, and returned to work May 21st. When asked on direct examination the kind of work Thompson did from then on, the reply was: "He did his regular run of work from then on." He was then asked: "Did you notice any difference in the work he did from that time on, from what he had done previously?" And his answer was: "No, because the work was slowing up to what it had been previous, due

to less horses dying." Testifying further, the witness stated that Thompson worked under him from May 21st, 1936, to the last day on which he worked; that he was first sent to Franklin Square Hospital on January 8th, 1937, and that he resumed work again on February 1st, 1937; was next sent to the same hospital on February 28th, and died March 7th, 1937.

On cross-examination, the witness was confronted with an apparent variance between his testimony in chief and testimony he had previously given before the accident commission, (a) in that he had not there stated that Thompson refused to let him see the injury; (b) in that before the commission he was asked: "Did he say he struck the radiator pipes?" And his reply was: "He didn't tell me he struck the radiator pipes"; and (c) that before the commission the witness stated, in substance, that he did not ask Thompson what he fell against and that Thompson did not tell him what he struck. It may be added that counsel for the appellees at this point in the testimony admitted the above answers of the witness before the commission.

Dr. Walter B. Wise, produced on behalf of the appellees, testified that he was chief surgeon at Mercy Hospital; that he had in his possession all the records of the hospital with respect to Thompson's case; that they showed that Thompson was first treated in the out-patient department for chronic bronchitis and given a standard cough mixture; that Thompson had complained that "gas from stock seems to interfere with breathing"; that according to the records his next connection with Thompson's case was on March 19th, 1936, through receipt of the original hospital record of that date from the out-patient department; that the record showed the following: "Nature and extent of injury, chronic bronchitis, with emphysema," explaining that chronic bronchitis with chronic myocarditis "means heart infection with edema, or swelling of the ankles"; that edema and myocarditis are terms indicating heart disease; that to develop edema of the ankles the heart affection would

have to be of some duration; and that he did not have personal contact with the patient on either of the above occasions. Thereupon the Mercy Hospital records of the case were admitted in evidence; the diagnosis on the admission of March 21st, 1936, being "Arterio-Sclerotic Cardio-Vascular Disease and accompanying condition of Dental Caries." His discharge note as of April 4th, 1936, showed that his course in the hospital was "uneventful"; and that "weakness and swelling of legs with dyspnea disappeared on bed rest." The report also showed a condition at the time of discharge as "improved."

Stating that he did not recall having had direct contact with Thompson upon the occasion of his first admission to the hospital, Dr. Wise then testified that he saw him on May 2nd, 1936, when he was again admitted; that his record showed that the patient then stated that while on a ladder it slipped causing him to fall; that in some way it was brought to his knowledge that Thompson had been a patient at the hospital on a previous occasion with heart disease, and he then looked him over for injuries and did not find any; the witness did not find any bruises or contusions; made a cursory examination with respect to the patient's heart, but no tentative findings; that he saw Thompson again between May 2nd and May 6th, but did not meanwhile treat him. A letter which he wrote to the insurer was admitted in evidence; the purport of which was to advise that as of May 6th, 1936, the employee was then a patient in Mercy Hospital; the details of the accident as stated by the employee; that the latter had previously been a patient in the hospital for a bad heart disease, and that the fall had upset his heart condition very badly. The letter concluded as follows: "The outlook is grave. How much the accident had to do with his present condition, of course, is difficult to say."

The witness stated that he saw Thompson from time to time, and that he was discharged from the hospital as "improved," the diagnosis being arterio-sclerotic cardio-vascular disease, cardiac hypertrophy.

Dr. Wise was further examined as to the condition of the employee for the purpose of eliciting an expert opinion from him, and upon signifying that he could not answer a hypothetical question then propounded to him, without qualification to a considerable degree, and without considering the opinions of Dr. Smith and Dr. Peters, two other physicians who had also examined the employee, he was withdrawn as a witness, and Dr. William H. Smith was called on behalf of the appellees.

Turning now to the consideration of the above exceptions, in the order of their sequence (it being noted that exceptions Nos. 1, 39, 40, 42, 43 and 64 have been abandoned), it is observed that exceptions 2 to 13, inclusive, relate to rulings upon evidence during the course of the examination of Dr. Smith, the physician in charge of Franklin Square Hospital upon the occasions when the appellant's decedent was admitted therein.

The doctor testified that the two admissions of Mr. Thompson were under his general supervision; that he had with him the hospital notes in both cases, but that with respect to the significant parts of the first hospital record, the notes were made by his assistant, Dr. Schreiber, who was then present; that the first diagnosis of the case was arterio-sclerotic myocarditis; that the first admission was on January 8th, 1937; that the patient was discharged twenty-one days later; that the history of the case showed that the patient complained of swelling of ankles and shortness of breath; that he made no reference to any accidental injury; that he got along nicely at the hospital and was discharged as being "improved," which meant that the patient "had recovered from the breakdown his heart showed"; that he examined the patient while he was at the hospital and found that he had a general hardening of the arteries which was manifest in his heart, and which, in his opinion, was a condition of long duration.

The witness then proceeded to detail the facts connected with the second admission to the same hospital, testifying that the patient was admitted on February

28th, 1937, and died on March 7th, 1937; that Thompson was under his care; that his complaint was shortness of breath and swelling of the ankles; that he stated that up to two weeks prior to his second admission he felt well; had been working and his ankles started to swell; that he then began to suffer shortness of breath and had to sit up at night to catch his breath; that the diagnosis on the hospital chart showed myocarditis with decompensation, lobar pneumonia with effusion accompanied with mitral insufficiency, all of which he described as meaning practically the same thing; and that the cause of death was "arterio-sclerotic myocarditis cardio vascular disease, right hydro-thorax and myocardial insufficiency," which, except as to hydro-thorax-water in the chest, simply meant that the patient died of heart disease.

Further examination of Dr. Smith elicited that while he was not a heart specialist he had had extensive experience in heart diagnosis and treatment; that he had read the Mercy Hospital records in the case; that he had heard the testimony of Dr. Wise, and that he was familiar with the Mercy Hospital record showing the first diagnosis of the case.

On the second day of the trial, after an intermission in the examination of Dr. Smith for the purpose of introducing in evidence the record of proceedings before the State Industrial Accident Commission, which showed a compromise settlement of an original claim for compensation for the injury of May 2nd, 1936, filed by the employee and approved by the commission, Dr. Smith was recalled, and after being asked the usual preliminary questions was then asked the following hypothetical question:

"Now, have you an opinion, using as a basis for your opinion only the facts testified to in this case, including therein your examinations and findings at Franklin Square Hospital on the two occasions, including therein all of the facts stated in the Mercy Hospital Records, which include the two histories, and particularly the

statement by the decedent with respect to the alleged injury of May 2nd, 1936, and having in mind the fact that the deceased was at Mercy Hospital from March 21st to April 4th, at which time he was discharged as improved, and returned to work on April 13th, and returned there in Mercy Hospital at the time of the alleged injury, history of which was given in the record, from May 2nd to his discharge on May 18th, following which time he went back to work, to the same work on May 21st, and assuming as a fact that this deceased did laboring work regularly prior to his first hospitalization at Mercy Hospital, regularly after his return to work on April 13th up to May 2nd, when he went to Mercy Hospital the second time, and regularly from May 21st up to the time, approximately the time in January, 1937, when he first entered Franklin Square Hospital under your care; assuming that the work he did during the intervening time between May 21st and when he first came to Franklin Square Hospital was the same or substantially the same and the manner in which he did it was the same or substantially the same as before that visit to the Mercy Hospital; assuming the testimony you heard read in court this morning, and the deceased's own statement with respect to his own condition on June 3rd, 1936, after the second discharge from Mercy Hospital; assuming the hospital record histories which you have at Franklin Square Hospital, assuming all of this data to be true, and excluding the opinions of any other persons, have you an opinion as to whether or not the alleged fall, as recited in the claim blank of the deceased employee, and as given in the Mercy Hospital entrance note on May 2nd, 1936, have you an opinion whether that fall or alleged injury had anything to do with John Thompson's death?"

Objection being made to the question, counsel for the appellees then added to it by saying to the witness: "We will add to the facts that you are to assume also the report of Mercy Hospital with respect to the findings of fact and the accident or out-patient department of March

19th. before the actual entry on the 21st, and we also add all the evidence of Mr. Pinkine, assuming to be a fact given in this case from the time he took the stand, which you heard in this court."

The court then asked the witness if he had heard Mr. Pinkine and the reply was: "I heard him say there was a question at one time whether the man had an injury." Thereupon a colloquy ensued between counsel, the court, and the witness, indicating that the witness had not heard any of the testimony of the witness Fritz as well as only a part of that of the witness Pinkine. The court then ordered the latter testimony to be read down to where the witness would indicate he heard the testimony, which order was complied with.

Counsel for appellant then requested that the question as supplemented be redrafted and propounded to the witness, objecting to its being answered in its then form. The objection was overruled, and exceptions to that ruling and the refusal of the court, upon motion, to strike out the answer to the effect that the witness had an affirmative opinion, which later over objection he was permitted to give, forms the basis of the first group of exceptions.

As will be observed, the testimony of the witness Fritz had neither been heard in court or read by the witness at this point, and it is also apparent that in some respects the previous testimony was conflicting, as for example, the question assumed that Thompson, subsequent to the date of the accident, returned to the scene of his employment on May 21st, 1936, and worked until January, 1937, when he first entered Franklin Square Hospital, and performed the same or substantially the same work in the same or substantially the same manner as before his first visit to Mercy Hospital, although there was testimony in the record tending to show that his work was meanwhile slowing down.

Apart, therefore, from the piecemeal method in which the lengthy hypothetical question was propounded to the witness, it would seem that it was objectionable for the

reasons above indicated. No better illustration of this observation need be given than the following excerpt from the record developed during the course of the examination of Dr. Smith:

"Q. Now I am asking the Doctor which testimony he is assuming to be true, whether the man struck the radiator pipes or did not strike the radiator pipes? A. Well, to tell the truth, I do not know whether he did or not because the testimony at one time said he did and at another time said he did not."

It is true that, through subsequent examination by the trial court, the witness stated that, assuming the deceased did or did not have an injury from a fall, it would not change his opinion either way. But we do not agree that the subsequent answer cured the obvious objection that the witness was basing his answer on conflicting testimony.

In 20 *Am. Jur.*, sec. 790, the rule is thus stated: "All courts agree that if there is any conflict between the witnesses as to facts on which an expert opinion is sought, the expert witness cannot, although he has heard the testimony, be asked to base his opinion on that testimony, because, to reach his conclusion, he must necessarily invade the province of the jury and pass on the credibility of witnesses and the weight of the evidence. In cases of conflict in the testimony heard by experts, a hypothetical statement of facts upon which their opinion is sought is required. It is generally agreed also that if the facts testified to by other witnesses are doubtful and remain to be found by the jury, it is improper to ask an expert who has heard the evidence for his opinion based on such evidence."

The practice of permitting an expert to express an opinion based upon facts in the evidence which he has heard or read, upon the assumption that those facts are true, is well established in this state. *Jerry v. Townshend*, 9 Md. 145; *Baltimore City Pass. Ry. Co. v. Tanner*, 90 Md. 315, 45 A. 188; *Berry Will Case*, 93 Md. 560, 49 A. 401; *Owings v. Dayhoff*, 159 Md. 403, 151 A. 240;

*Rickards v. State,* 129 Md. 184, 98 A. 525; *Daugherty v. Robinson,* 143 Md. 259, 122 A. 124; *Gordon v. Opalecky,* 152 Md. 536, 137 A. 299; *Balto. & O. R. Co. v. Brooks,* 158 Md. 149, 148 A. 276; *Baltimore v. State,* 132 Md. 113, 103 A. 426; *Quimby v. Greenhawk,* 166 Md. 335, 337, 171 A. 59; *Mt. Royal Cab Co. v. Dolan,* 168 Md. 633, 179 A. 54; *Calder v. Levi,* 168 Md. 260, 177 A. 392; *Mead v. Gilbert,* 170 Md. 592, 185 A. 668.

In *Quimby v. Greenhawk, supra,* in commenting upon the premises upon which a hypothetical question and the answer thereto must be based, it is said: "The problem is largely left to the sound discretion of the trial court, but clearly it is improper to admit an expert's inference or conclusion upon the reading or hearing either of all or of a specified part of the testimony in the case, if such whole or part of the testimony so submitted as the premises for an inference or conclusion is conflicting in the important assumptions of factual truth to be made." *Wigmore on Evidence,* 2nd Ed., sec. 681; 1 *Greenleaf on Evidence* (16th Ed.), secs. 441 K. 441 L; *Jones on Evidence* (3rd Ed.), sec. 370.

As guided by the indicated rules of evidence, therefore, it is our conclusion that there was error in permitting the hypothetical question as submitted to be propounded, and in refusing to strike out the answer of the witness to the same.

The remaining exceptions as to rulings upon evidence by the trial court practically all relate to hypothetical questions directed to Dr. Walter D. Wise, chief surgeon on the staff of Mercy Hospital, Dr. Raymond Peters, also connected with Mercy Hospital, and Dr. Morris B. Schreiber, who was connected with Franklin Square Hospital on the two occasions when Thompson was admitted to that institution. Dr. Wise, upon resuming the witness stand, after stating that he had been in court throughout the trial of the case and had heard all the testimony offered in evidence, was asked the following question: "Assuming as true the testimony and the evidence, the record evidence that you have seen offered in

evidence; assuming that to be true, will you state from your own experience, in addition to what you have heard in this case, whether or not you are in a position to give an opinion as to whether or not there was any causal connection between the alleged accident of May 2nd, 1936, and the death on March 7th, 1937?"

Upon objection to the question, the same was amended as follows: "Now, then, add to that, you will exclude the opinion of any one else who testified in this case or any other opinion in the records"; and upon further objection, the court added: "Now, before you go further, there has been some conflicting testimony, or apparently conflicting testimony, about whether this man struck himself after he fell, and in giving this answer I want you to assume everything, where there is a conflict, assume the truth of that testimony that is most favorable to the man's side of the case. That is, if some one said he did strike himself, assume he did." Exceptions were reserved to the over-ruling of objections (a) to the question, (b) to the amended question, (c) to the court's instruction, and (d) to the motion to strike out the answer: "I do not think there was a causal connection."

For reasons heretofore stated, as well as for the manner in which the question was framed, that is to say, by successive amendments, well calculated to confuse the jury as to what the doctor was, in the last analysis, supposed to answer, we are of the opinion that error was committed in the successive rulings above indicated, and that the objection to the question and the motion to strike out the answer should have been sustained.

Dr. Schreiber was asked a hypothetical question, which related back to the amended question put to Dr. Wise, and assumed that Thompson fell against a radiator from a ladder on May 2nd, 1936, and that, between his discharge in May and his first entry in Franklin Square Hospital, "he did rather heavy laboring work of the same kind that he had done prior to the very first hospitalization, in the same manner as he had before," and was

then asked: "Can you express an opinion as to whether or not the assumed accidental injury of May 2nd, 1936, had any causal connection whatever with the deceased's death on March 7th, 1937?" We have been unable to find in the voluminous record before us that the work performed by Thompson was such as was assumed in the above question. It may have been, but that was a fact for the jury to determine. Furthermore, as has been stated, there is testimony in the record to the effect that he did not perform the same amount of work as before the accident, and the question asked Dr. Schreiber did not exclude the opinion of Dr. Wise from the hypothesis upon which the opinion of the then expert witness was sought. *Quimby v. Greenhawk, supra; Calder v. Levi, supra.* Our conclusion, therefore, is that the rulings permitting the question to be interrogated the witness, and in refusing to strike out the answer thereto, were also erroneous.

In view of what has been said, it would serve no useful purpose to separately consider the exceptions reserved during the course of the examinations of Drs. Grenzer and Flynn, except to note that their testimony, in the main, was chiefly directed to their personal knowledge of the physical condition of Thompson, acquired as attending physicians, and that we find no reversible error in the rulings of the trial court during the course of their examination.

Exceptions 42, 43, and 44, and exceptions 46 to 61, inclusive, were reserved during the course of the examination of Dr. Peters. The hypothetical question propounded to Dr. Peters, we think, is not subject to the criticisms discussed with reference to the hypothetical questions previously considered, and, accordingly, 'we find no reversible error in the court's rulings during the course of the examination of the last mentioned witness.

Nor do we find error in the rulings of the trial court as raised by exceptions 62 and 63. In this connection it is submitted by the appellant that the court erred in refusing to permit to be read to the jury certain excerpts

embraced in the transcript of the appellant's testimony before the commission, which on its face showed that her answers to the particular questions covered by the exceptions were purely matters of opinion, and not based on any factual knowledge of the witness.

It has been the common practice to read as evidence, on trial of appeals from the commission, the testimony taken before it, as duly authenticated in the transmitted record of its proceedings, and it has been held that questions as to the admissibility of any testimony contained in the record from the commission could be raised and determined in the trial court, on appeal. *Standard Gas Equipment Corp. v. Baldwin,* 152 Md. 321, 136 A. 644; *Savage Mfg. Co. v. Magne,* 154 Md. 46, 139 A. 570; *Spence v. Bethlehem Steel Co.,* 173 Md. 539, 197 A. 302.

At the conclusion of all testimony, the appellant offered five prayers. The first of which was granted in connection with the first prayer of the appellees; the second was granted in connection with the fourth prayer of the appellees; the third was granted in connection with the seventh A prayer of the appellees; the fourth was granted, and the fifth was refused.

Of the instructions offered by the appellees, their third, fifth A, sixth A, eighth A and ninth A prayers were granted; their first was granted in connection with the first prayer of the appellant; their fourth was granted in connection with the second prayer of the appellant; and their seventh A was granted in connection with the third prayer of the appellant.

The appellant specially excepted to the appellees' fifth A prayer upon the ground that there was no legally sufficient evidence to show that the deceased employee died from natural causes; and also specially excepted to the appellees' sixth A prayer for the following reasons: that there was no evidence in the case legally sufficient to show (a) that the deceased employee worked steadily until about January 8th, 1937; (b) that he had a long standing heart disease or condition; and (c) that he had a progressive heart disease or condition. And exception

sixty-six brings before us for review the propriety of the trial court in over-ruling the above special exceptions; in refusing the fifth prayer of the appellant; and in granting the above prayers of the appellees.

As to the indicated special exceptions, we find no error in the ruling of the trial court. The prayers to which they were directed submitted to the jury (a) that if they should find from the evidence in the case that the employee had recovered from whatever "ill effects," if any they might find, resulting from his fall, and thereafter died solely as a result of disease or natural causes, then their answer to the second issue should be "no"; and (b) that if they should find from the said evidence that he recovered from whatever effects, if any, they find to have resulted from his fall on May 2nd, 1936, and returned to work on May 21st, 1936, and worked steadily until about January 8th, 1937, and shall further find that his death was solely the result of a long standing or progressive heart disease or condition, then their answer to said issue should be "no."

Without again reviewing the lengthy testimony in the record, it is our opinion that there was evidence therein sufficient to support the theory of the prayers. Moreover, the record shows that in connection with the action of the trial court in overruling the special exceptions and granting the above prayers, the appellant by her third and fourth granted prayers was permitted instructions which clearly informed the jury that under the law of the case, even though they found from the evidence that the deceased employee was suffering or afflicted with heart disease prior to the date of an accident resulting in an injury sustained and arising out of or in the course of his employment, and further found that, as a result of such injury, such heart disease was aggravated or accelerated, and that the death of the employee resulted from such aggravation or acceleration of such heart disease, then the answer of the jury must be to the effect that the death was the result of an accidental injury. And further that if they found that the

death of the employee was due to myocardial failure, embolism and bronchopneumonia and that said death as a result of said disease was accelerated as a result of said injury, then their answer must be to the same effect, even though they found from the evidence that the deceased was suffering, prior to and at the time he received such accidental injury, with arterio-sclerotic cardio-vascular disease.

The fifth prayer of the appellant submitted an instruction that, if the jury found that the employee died on March 7th, 1937; that he was accidently injured on May 2nd, 1936, as a result of falling from a ladder; that said injury arose out of and in the course of his employment, and if they fulther found that said injury hastened his death by producing heart failure from which he died, then their answer to the second issue must be yes, even though they found that he was suffering, prior to and at the time he received said accidental injury, with a disease known as arterio-sclerotic cardio-vascular disease.

In view of the fact that the granted instructions fully covered the law under which the claimant was entitled to recover, if at all, in spite of any heart disease he may have had, the terms "hastened" and "heart failure" might well have proved misleading to the jury, in other words, tended to confound their meaning, respectively, with the terms "accelerated" and "heart disease," as used in the claimant's granted prayers. Accordingly, our conclusion is that this ruling was without error, and that the other rulings on the prayers were without reversible error.

It appears from the record that the court sustained the appellant's objection to the proffer of proof sought to be introduced in evidence by the appellees, advising the jury, that, although Drs. Smith and Peters, witnesses produced by the appellees, had testified before the commission that in their opinion there was no causal connection between the death and the alleged accident, nevertheless the commission on motion struck out said opin-

ions, notwithstanding that the court, upon inspecting the transcript of the testimony taken before the commission, found the aforegoing to be a fact. In this state of the record, counsel for the appellant, in his argument to the jury, stated that the commission did consider the testimony of Drs. Smith and Peters in arriving at their decision, thereby, in effect, giving the jury an impression that the opinions of the two doctors indicated, as given by them in the trial before the jury, were likewise given by them to, and considered by, the commission. After argument of counsel for the appellant was completed, the trial court on its own initiative ruled that, because of said reference by appellant's counsel, the court would permit counsel for the appellees in the closing argument to state to the jury that the commission did not consider the opinions of the two doctors to the effect that there was no causal connection between the death and the alleged accidental injury, which latter ruling of the court is the basis for the sixty-seventh exception.

The bare statement of the facts upon which the exception is founded would seem to indicate that the ruling was correct. *Balto. & O. R. Co. v. Boyd*, 67 Md. 32, 10 A. 315; *Balto. & O. R. Co. v. State, use of Black*, 107 Md. 642, 69 A. 439, 72 A. 340; *Christian v. Johnson Construction Co.*, 161 Md. 87, 155 A. 181.

Finally, it also appears that the records of the Franklin Square Hospital pertaining to the case of Thompson upon the two occasions on which he was treated at that institution were, through oversight, not formally offered and admitted in evidence during the trial of the case. This omission was not discovered until after the trial and judgment, and counsel for the appellant submit in their brief that the above hospital records may not be considered as being in evidence.

It is not contended that the Franklin Square records were not referred to and treated as being admitted in evidence by counsel for the respective parties, in the same manner as if they had been formally offered and admitted in the case. Witnesses were examined and

cross-examined from parts of said records by counsel for both sides, and they were regarded as having been formally offered and admitted in evidence.

In *Dean v. Eastern Shore Trust Co.*, 159 Md. 213, 150 A. 797, 800, this court quoted with approval *Bevington v. State*, 2 Ohio St. 160, wherein it was said: "When an instrument in writing is produced by a party on a trial as evidence, and witnesses examined in relation to it without objection to its admissibility from the other side, it is not error for the court to regard it as in evidence, although not formally offered and read by the party producing it."

It is true that this question is not before us on exception, but, in view of the fact that it has been argued, we have deemed it proper to refer to it, and to express our view that these records must, under the facts above stated, be regarded as evidence now proper to be considered.

For reasons stated, the judgment will be reversed.

*Judgment reversed with costs and new trial awarded.*