STATE, Use of SOLOMON, et al. *v.* FISHEL

[No. 161, September Term, 1961.]

190

*Decided March 23, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Harry Goldman, Jr.,* and *L. Robert Evans,* for appellants.

*Paul F. Due* and *G. C. A. Anderson,* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from a judgment entered upon the verdict of a jury in favor of the defendant in a medical malpractice death case. The widow and infant children of the decedent sued the defendant surgeon for damages under the Death by Wrongful Act statute, and the widow, as executrix, also brought suit against the surgeon for medical expenses and for pain and suffering. The two causes of action were joined in one declaration. The plaintiffs charged the defendant with negligence in delaying hospitalization and in delaying an operation. The charge of delaying the operation as made in the original declaration related to the time of the admission of the decedent to a hospital. As amended after the testimony had been concluded but before the case went to the jury, this charge pertained to a period some hours later.

The contentions raised by the plaintiffs-appellants relate (a) to the admission of opinion testimony by expert witnesses for

the appellee and (b) to instructions to the jury. They challenge the expert testimony on the ground that hypothetical questions, identifying the facts upon which the experts' opinions were based, were not used. This presents the most important problem in the case. The defendant-appellee controverts both of the appellants' contentions, and contends at the outset that his motion for a directed verdict should have been granted. We shall consider the appellants' contentions first.

Most of the facts in the case are clear and undisputed. The decedent, Mr. Solomon, was a man thirty-six years old at the time of his death on October 9, 1956. The first known manifestation of his last illness, which ultimately proved to be due to a bleeding duodenal ulcer, came early in the morning of Friday, October 5, 1956, when he vomited a dark, coffee-colored liquid and passed some blood rectally on several occasions and also had some stomach spasm. He consulted Dr. James Frenkil, who was his employer's compensation physician, about the middle of that day. Dr. Frenkil suspected gastro-intestinal trouble and made an appointment for Mr. Solomon to have a barium x-ray examination made the next morning. Dr. Frenkil noted that Mr. Solomon was nervous about his wife, who was then pregnant. He told Mr. Solomon to go home and put an ice bag on his stomach; and, as Dr. Frenkil was going out of town, he instructed him in case of further trouble to call the defendant, Dr. Fishel, who was associated with Dr. Frenkil. Dr. Fishel had only recently entered private practice, but he had had excellent surgical training and experience, including a good deal of abdominal surgery and, specifically, some gastro-intestinal surgery.

Mr. Solomon did have more bloody bowel movements and telephoned Dr. Fishel at about 7 P.M. Dr. Fishel visited Mr. Solomon at the latter's home at about 8:30 or 9:00 P.M. and took a history from him. In it Mr. Solomon stated that he had not had any bowel trouble prior to his current illness, and Dr. Fishel prescribed paregoric for the night. In the history then taken Dr. Fishel noted that there were some indications of prior indigestion, but that the patient denied having consulted any doctor for the treatment of ulcers, indigestion or anything relating to the intestinal tract. He also denied that he was

nervous or worried about anything except the condition of his wife who was then pregnant. After he entered the hospital on Sunday afternoon he gave a history disclosing that he had consulted a doctor about some stomach trouble about a year earlier and had been given probanthene, which is a medication to quiet irritability of the stomach, but that he had taken none for about six months. It later developed also that he had worries about his job. Mr. Solomon also told Dr. Fishel at this first interview on Friday evening that he had had some high and some low blood pressure, which had fluctuated with his weight. Dr. Fishel took Mr. Solomon's blood pressure and pulse, both of which were good.

During the night Mr. Solomon passed more blood rectally and nearly fainted on Saturday morning. He telephoned Dr. Fishel, who again came to see him, thought him in no condition to go in town for his scheduled barium examination, and arranged for a laboratory technician to come out, obtain a blood sample and make tests of it and report to Dr. Fishel. This was done. The report showed a hemoglobin count of 8.8 as against a stated normal of 14 and a hematocrit count of 25 as against a stated normal of about 45. Dr. Fishel again went to see Mr. Solomon, recommended hospitalization and, by telephone from Mr. Solomon's home, found he could obtain an emergency bed in a ward at Sinai Hospital, which was the hospital of the patient's choice. Mr. Solomon declined or refused to go to the hospital. He did not wish to be hospitalized, he was concerned about his wife's condition (she had had some bleeding in connection with her pregnancy), and he did not wish to go into the hospital as a ward patient. There is a dispute as to what was then said by Dr. Fishel with regard to the need for, or urgency of hospital treatment. This will be more fully considered later.

Mr. Solomon telephoned Dr. Fishel the next morning, Sunday, October 7th, at about 9:30 or 10:00, and said that he was feeling somewhat weaker and was then willing to go to the hospital. Dr. Fishel again went to see him. He tried to get a room at Sinai Hospital, but could not, and then tried another hospital without success. He suggested a third where he

had privileges, but Mr. Solomon did not wish to go there. Through another doctor, and with Dr. Fishel's approval, the Solomons then tried to get a bed at Sinai, also without success. Dr. Fishel then left the Solomons' home, went to Sinai Hospital and renewed his request for a bed. None was then available, but a room did become available a little later. The Solomons were notified and Mr. Solomon's brother brought the decedent in. As Dr. Fishel returned from a nearby hospital, he found Mr. Solomon in a wheel chair in the foyer. He was admitted to the hospital at about four o'clock.

At the time of his admission Mr. Solomon still presented something of a diagnostic problem. Since Dr. Fishel was a surgeon, Mr. Solomon was first placed on the surgical service of the hospital. With Mr. Solomon's consent, Dr. Fishel then sought the assistance of a medical doctor experienced in gastro-enterology. The first man whom Dr. Fishel called was about to leave town on an extended trip and suggested several others, among them Dr. Leon E. Kassel, whom Mr. Solomon selected. Drs. Kassel and Fishel had a consultation at once and Dr. Kassel also saw Mr. Solomon privately. The patient told him that Dr. Fishel had recommended hospitalization the day before but that he did not go because of his desire to avoid hospitalization.

When Dr. Kassel entered the case Mr. Solomon was transferred to the medical service of the hospital. Though the primary responsibility under hospital practice then appears to have become Dr. Kassel's, it is customary for medical and surgical men to work together as a team in cases of this sort, and Dr. Fishel does not take the position that he was relieved of responsibility.

In the treatment of bleeding gastro-intestinal ulcers, there are several well recognized methods of treatment. One is merely to use blood transfusions to replace lost blood, to keep the patient out of shock and to give nature a chance to stop the bleeding by forming a clot that will hold. Another is to operate at once. A third is more or less a combination of the first two. This is to test transfusions as a means of stopping the bleeding, to watch the patient closely, and if the transfu-

sions are not accomplishing the desired result of stopping or at least slowing down the bleeding then to resort to surgery. The use of transfusion tests is generally considered particularly desirable in the case of patients under forty years of age. There seems to be no fixed standard as to the duration of the test period. The decision to operate, if made, is made by the medical and surgical men working together. Prior to such a decision it is customary that the patient be on the medical service. The third method of treatment and the usual practice thereunder were followed in Mr. Solomon's case, and the plaintiffs do not attack the choice of method. So far as treatment is concerned their attacks are directed primarily against the timing.

Mr. Solomon had a transient drop in blood pressure at about 6:30 that Sunday afternoon but it came up again before his first transfusion was completed. By ten o'clock his blood pressure appeared stablized, his hematocrit had begun to rise and his condition seemed satisfactory with indications that the bleeding had stopped or had slowed down preparatory to stopping. Dr. Fishel left the hospital at about ten o'clock, being subject to call if needed.

At about 10:50 that night Mr. Solomon vomited more blood, but when Dr. Kassel left at about eleven o'clock he thought the patient was in satisfactory condition and that the policy of continued watchful waiting was indicated.

Mr. Solomon continued to lose blood during the night and an intern called Dr. Kassel at about 5:30 the next (Monday) morning. Dr. Kassel went to the hospital and arrived between 6:30 and 7:00 o'clock, and saw Mr. Solomon and concluded that he should have surgery promptly. Mr. Solomon was unwilling to have it, even after an hour and a half's talk with Dr. Kassel. Dr. Kassel called to notify Dr. Fishel of the situation, but found that Dr. Fishel was already on his way to the hospital. He arrived at about 8:00 or 8:30 A.M. Dr. Kassel had just left on an emergency case. Dr. Fishel checked Mr. Solomon's condition and saw him two or three times to urge surgery, but without success. Dr. Kassel returned and at about 10:15 A.M. called in the chief of medicine of the

hospital to try to persuade Mr. Solomon to have an operation. At about 11 A.M. he was successful in doing so. After Mr. Solomon's consent was obtained there was a delay of some additional two hours, during which the family could not agree whether to have Dr. Fishel perform the operation or to have another doctor who was older and more experienced perform it. The final decision was in favor of asking the other doctor to operate and he did so. Anesthesia began at about 2:00 P.M. on Monday and the actual operation lasted nearly four hours, ending at about 6:15 P.M. Transfusions were continued during its progress. The patient was found to have a duodenal ulcer which was bleeding rather profusely and because of the edematous (full of fluid) and friable (breaking or tearing easily) condition of the stump of the duodenum, the surgeon was unable to close the area to his complete satisfaction, even with the use of a tube. However, the patient left the operating room and the recovery room in good condition.

Transfusions were continued, but Mr. Solomon died about twenty-four hours after the operation. There is some question, which we think it unnecessary for us to resolve, as to the exact cause of death. One theory which derives some of its support from the defendant's answer to an interrogatory is, in brief, that death was due to hemorrhages, to which the plaintiffs allege undue delay in hospitalization contributed. The other, also in brief, is that it was due to overtransfusion to offset the loss of blood (which, if it occurred, happened after the defendant was no longer on the case). Whatever the exact cause of death, if the defendant is to be held liable for the death, the foundation of his liability must be some want of skill, care or diligence in his treatment of the patient; and on the stand he accepted the "full responsibility" for whatever he did in the case.

The first question then with regard to the defendant's liability is whether or not he did fail to exercise the amount of care, skill and diligence as a physician and surgeon which is exercised generally in the community (the City of Baltimore) in which he was practising by doctors engaged in the same field. See *Lane v. Calvert*, 215 Md. 457, 462, 138 A. 2d 902,.

and cases therein cited. (Causation must, of course, also be shown in order to establish liability, but we are not at this point concerned with it.) In medical malpractice cases ordinarily the main issue of the defendant's use of suitable professional skill is a topic calling for expert testimony only. *Fink v. Steele,* 166 Md. 354, 361, 171 A. 49, citing Wigmore, *Evidence* (2nd Ed.), § 2090 [3rd Ed., Vol. 7, § 2090]. See also *Galusca v. Dodd,* 189 Md. 666, 668-69, 57 A. 2d 313. Certainly this case is no exception to that general rule.

The plaintiffs' objections to the defendant's questions to his expert witnesses are essentially that they were based upon conflicting evidence and that hypothetical questions eliminating such conflicts should have been employed.

Some confusion has been injected into this case by the form of at least some of the plaintiffs' objections, which strongly suggest that the plaintiffs claimed that only a full hypothetical question could be used, and by the defendant's counter argument at the trial that a question based upon the evidence already submitted was not hypothetical. Neither contention would be well founded.

A question designed to elicit the opinion of an expert witness based not upon his personal observation, but upon the testimony of others and such data as hospital records, need not be in the usual (and generally cumbersome) form of a hypothetical question. *Quimby v. Greenhawk,* 166 Md. 335, 338, 171 A. 59, and cases therein cited; *Industrial Service Co. v. State,* 176 Md. 625, 634, 6 A. 2d 372; *Thompson v. Standard Wholesale Phosphate, Etc., Works,* 178 Md. 305, 13 A. 2d 328; *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse,* 187 Md. 375, 50 A. 2d 256; *Twombley v. Fuller Brush Co.,* 221 Md. 476, 158 A. 2d 110.

On the other hand, where, as in this case, an expert is asked to express his opinion on the basis of the testimony of others and upon documentary evidence (mainly hospital records), the foundation for his opinion, not being facts within his personal knowledge or observation, is a set of facts which, as to him, is necessarily hypothetical. In the words of Judge Parke in *Quimby v. Greenhawk, supra,* 166 Md. at 338-339: "the

hearing or reading of the testimony is accepted as an imperfect substitute for the formal hypothetical question in furnishing the data for inference by the expert witness." Whether this form of questioning is more accurately described as an imperfect substitute for the formal hypothetical question, or as a variant thereof, it is still essentially a form of presenting a hypothesis upon which an opinion is to be expressed. See McCormick, *Evidence*, § 14, p. 30. See also *Williams v. Dawidowicz*, 209 Md. 77, 86-87, 120 A. 2d 399.

Not without some doubt, we shall treat the plaintiffs' objections to the questions put to the defendant's expert witnesses as going beyond making the unsustainable contention that a formal hypothetical question specifying all data to be assumed by the witnesses had to be employed, and as sufficiently challenging the form of questioning used by the defendant and the admissibility of the answers elicited by such questions.

In *Gordon v. Opalecky*, 152 Md. 536, 548-49, 137 A. 299, this court, in speaking of questions addressed to expert medical witnesses to elicit their opinions based upon facts not within the personal knowledge or observation of such witnesses said: "Such questions are usually and properly asked in one of two ways. One is where the evidence is uncontradicted and the witness has heard or read it. In such a case he is asked to express an opinion predicated upon the assumption that the evidence thus known to him is true. The other way is to state to the witness such facts as are essential to the formation of a fair and intelligent opinion, ask him to assume the truth of the facts so stated, and to express an opinion upon them." This passage was quoted with approval in *Ihrie v. Anthony*, 205 Md. 296, at 309-10, 107 A. 2d 104. Another method, which is essentially a variant of the first and may be proper, is to ask the expert to base his opinion upon the testimony of a specified witness or witnesses, such testimony involving no contradictions. *Baltimore City Pass. Ry. Co. v. Tanner*, 90 Md. 315, 45 A. 188; *Damm v. State*, 128 Md. 665, 97 A. 645; *Rickards v. State*, 129 Md. 184, 98 A. 525; Wigmore, *Evidence* (3rd Ed.), § 681 (b), taking the position that the mat-

ter should be left to the discretion of the trial court. Cf. *Bethlehem Steel Co. v. Munday*, 212 Md. 214, 129 A. 2d 162, following Wigmore's rule and sustaining an exclusion.

The general rule is well established in this State that a question addressed to an expert witness asking for his opinion on the basis of all of the evidence in a case is improper if the evidence is conflicting. *Quimby v. Greenhawk, supra; Calder v. Levi*, 168 Md. 260, 177 A. 392; *Thompson v. Phosphate Works, supra*. The jury must be informed of the facts or assumed facts upon which the expert's opinion is based and there must be evidence to support such facts, but it is for the jury to determine whether they exist or not and, if the jury's finding on controverted questions of fact is contra to the premise upon which the expert bases his opinion, his opinion falls with the premise. See annotation on the admissibility of the opinion of an expert, 82 A. L. R. 1460, especially at pp. 1478-83, dealing with cases where the evidence is in conflict.

The plaintiffs assert that there are conflicts in the evidence upon which the defendant's experts based their opinions and they rely heavily upon *Thompson v. Phosphate Works, supra*, in support of their objections. In that compensation case it was claimed that an employee's death was due to injuries which he sustained when a ladder which he was climbing slipped on some grease and he fell and struck some radiator pipes. There were some conflicts in the evidence, one of which was whether or not the man had the fall and struck the radiator pipes. A long and piecemeal hypothetical question addressed to a medical expert called by the employer was held objectionable and one of the grounds for this holding was that it called for an opinion based on conflicting testimony. The doctor was asked which testimony he was assuming to be true as to whether or not the employee struck the radiator pipes. He said that he did not know which was the fact. Subsequently, under questioning by the trial court, the doctor stated that it would not change his opinion as to the cause of death either way, whether he assumed that the decedent did or did not have a fall. This court said (178 Md. at 318) : "But we do not agree that the subsequent answer cured the obvious objection that the wit-

ness was basing his answer on conflicting testimony." In support of this holding the court cited 20 Am. Jur., *Evidence,* § 790, which does not make any explicit reference to whether or not the conflict is with regard to a material question or not, though it would seem implicit that it contemplates a conflict on a material point, since it speaks of "any conflict between the witnesses as to facts on which an expert opinion is sought," and it is not readily to be supposed that an expert opinion would be sought on the basis of immaterial facts.

That the conflict must be on a material question in order to render the expert's opinion inadmissible seems to be clearly stated in *Quimby v. Greenhawk, supra* (166 Md. at 339), which is quoted in the *Thompson case* (178 Md. at 319) in support of the ruling now relied upon by the plaintiffs. It was said in *Quimby*: "it is improper to admit an expert's inference or conclusion upon the reading or hearing either of all or of a specified part of the testimony in the case, if such whole or part of the testimony, so submitted as the premises for an inference or conclusion, is *conflicting in the important assumptions of factual truth to be made. Wigmore on Evidence,* 2nd Ed., sec. 681 [3rd Ed., § 681] ; 1 *Greenleaf on Evidence* (16th Ed.), secs. 441 K, 441 L." (Italics ours, except as to citations.)

In *Thompson* there undoubtedly was a conflict in testimony with regard to the employee's alleged fall, and it might seem to medical laymen (such as ourselves) an important question. Yet the medical witness did not regard it as an important factor in arriving at his opinion. The court's holding that the medical witness' subsequent answer showing this to be the situation did not cure the objection to the original question seems to us to have been inconsistent with what we take to be the correct statement of the rule in *Quimby*—that in order to render an expert's opinion inadmissible because based upon conflicting evidence, the conflict must be with regard to an important fact. That, we take it, is one which would tend to lead the expert to one opinion if witness A's version were true and to a different opinion if witness B's conflicting version were true. To this extent we decline to follow the *Thompson* case.

There is some tendency to permit an expert to testify to his opinion and then to cross-examine him on the basis for it. McCormick, *Evidence,* § 14, p. 32. That was done in the case of the plaintiffs' expert witness. The hypothetical question is in considerable disrepute among legal scholars because of the confusion, obstruction and abuses which it has brought with it. See 2 Wigmore, *Evidence* (3rd Ed.), § 686; McCormick, *Evidence,* § 16; Judge Learned Hand, New York Bar Association Lectures on Legal Topics, 1921-22. It seems to us to give undesirable rigidity to the rule against an expert's basing his opinion on evidence which is to some extent conflicting to exclude his opinion where *after* he has stated it, he either makes clear which of the conflicting versions he accepts as correct or else makes it clear that he considers the difference between the versions immaterial insofar as his opinion is concerned. The purpose of informing the jury of the basis for his belief is served in either event.

The defendant's questions to his three expert witnesses asking for their opinions were, in substance, based upon *all* the evidence. The plaintiffs assert that there were conflicts with regard to three matters: first, what was said by Dr. Fishel to the decedent and his wife with regard to the urgency or lack of urgency of hospitalization on the afternoon of Saturday, October 6th; second, whether Dr. Fishel was responsible for the care and treatment of the decedent when he began losing blood at 11:00 P.M. on Sunday, October 7th; and third, the cause of death.

There is a sharp conflict of testimony between Mrs. Solomon and Dr. Fishel as to what the latter said with regard to the urgency of hospitalization on Saturday afternoon, October 6th. It is plain beyond reasonable dispute that Dr. Fishel considered hospitalization desirable, that he recommended it and promptly arranged for a bed. It is also clear that Mr. Solomon did not then go in. His reluctance, as we have noted above, was due to several causes—a desire to avoid hospitalization, a reluctance to accept a ward bed, and worry over his wife. Mrs. Solomon states Dr. Fishel said in substance that he sympathized with Mr. Solomon's views, that there was no emergency and that it was all right for Mr. Solomon to re-

main at home. Dr. Fishel denies ever having made any such statement as that there was no emergency or that it was all right for Mr. Solomon to remain at home that night. Dr. Fishel states that he said that he could not make Mr. Solomon go to the hospital.

The plaintiffs' expert, Dr. Friedman, expressed the opinion that Dr. Fishel had fallen short of the proper professional standard by not being absolutely insistent upon immediate hospitalization, and was very critical of him for not having withdrawn from the case when the patient declined to go to the hospital that Saturday afternoon.

With regard to the first point of conflict, the defendant's experts' testimony indicates that they were of the opinion that Mr. Solomon's condition on Saturday afternoon was such that immediate hospitalization was not imperative. Dr. Ravitch stated on direct examination that he thought the day's delay made no difference in the outcome. On cross-examination he made it fairly clear that he accepted as a fact that Mr. Solomon refused to go to the hospital. All three made it plain that Dr. Fishel could not force the patient to go to the hospital and all three agreed between themselves—and disagreed flatly with the plaintiffs' medical witness—that Dr. Fishel acted properly in not withdrawing from the case. Dr. Shackelford appears to have agreed with Dr. Ravitch's belief that the patient refused to go to the hospital, but he made it plain that he thought the difference in testimony with regard to what Dr. Fishel said was immaterial, insofar as his opinion as to the adequacy or propriety of Dr. Fishel's treatment of the case was concerned. Dr. Howard considered Dr. Fishel's handling of the situation proper if "Mr. Solomon declined hospitalization or begged off." Essentially, the difference of opinion seems to rest upon a difference in the inferences drawn from medical evidence as to the plaintiff's condition. This would not present such a conflict as to make their testimony inadmissible. *Twombley v. Fuller Brush Co., supra.* No one of them thought the conflict in testimony material because of their interpretation of the medical facts.

The second point of alleged conflict we think really does

not amount to that. Dr. Fishel consistently admitted that he was not discharged from responsibility for the patient after he was transferred to the medical service. The evidence is un-contradicted that the custom is for patients in such cases to be put on the medical service of the hospital and for the medi-cal and surgical men to work as a team. This was done.

The third point of alleged conflict relates to the ultimate cause of death of the patient. Dr. Ravitch's testimony made it quite clear which theory he adopted (overtransfusion). Dr. Shackelford expressed a like opinion and made it clear that he thought no negligence was imputable to anyone concerned in the case. Dr. Howard concluded his statement of his opin-ion and of the reasons therefor with this sentence: "Unless asked, I have no comment on the cause of death." Since his view on that subject was not included among the reasons for his opinion, it seems clear that he did not regard it as a ma-terial consideration in arriving at his opinion. Apparently no one else did at the time, for he was not asked the question. It would seem that if the cause of death was as Dr. Ravitch believed, there would have been a ground for exculpating the defendant from liability for lack of causation; but the doctors stated their opinions as to the treatment administered by Dr. Fishel, and it seems quite obvious that this treatment designed to end the bleeding would have been the same whichever of the suggested ultimate causes of death was the true one.

We think that the general questions based on "all the evi-dence" (excluding inferences and opinions) in this case were not in the best form or even in acceptable form, but that their defects were cured by the answers ultimately given, since the assumptions as to matters in dispute were either brought out or differences were shown to be immaterial in reaching the witnesses' opinions. Consequently, the defects in these ques-tions were not prejudicial and the rulings thereon are not ground for reversal. *Gordon v. Opalecky, supra; Wolfinger v. Frey,* 223 Md. 184, 162 A. 2d 745.

The appellants' exceptions to the instructions to the jury were directed to those dealing with a presumption that a sur-geon has properly discharged his duty and that his negligence

cannot be presumed, but must be affirmatively proved. The court instructed the jury in part as follows:

"[I]t is the duty of a surgeon to exercise ordinary care and skill in the treatment of patients and in the performance of an operation. This being the duty imposed by law, it will be presumed that the treatment and operation of Mr. Solomon was carefully and skillfully performed in the absence of proof to the contrary. As all persons are presumed to have duly performed any duty imposed on them, negligence cannot be presumed, but must be affirmatively proved. This principle is especially applicable in suits against surgeons."

The first exception was based specifically upon the last sentence. However, this whole instruction is an almost verbatim quotation from *State, Use of Janney v. Housekeeper,* 70 Md. 162, at 171, 16 A. 382, which was quoted with approval in *Miller v. Leib,* 109 Md. 414, at 426, 72 A. 466; and in *State, Use of Kalives v. Baltimore Eye, Ear & Throat Hospital, Inc.,* 177 Md. 517, 526, 10 A. 2d 612. See also *Angulo v. Hallar,* 137 Md. 227, at 233, 112 A. 179; *Fink v. Steele,* 166 Md. 354, at 360, 171 A. 49; *Bettigole v. Diener,* 210 Md. 537, at 541, 124 A. 2d 265; *Lane v. Calvert,* 215 Md. 457, at 462, 138 A. 2d 902; *State, Use of Shockey v. Washington Sanitarium & Hospital,* 223 Md. 554, at 558, 165 A. 2d 764, for statements of the general rule relating to the presumption stated in the above instruction.

We find no undue emphasis on the presumption in other parts of the charge, such as that stating that the death of the decedent raised no presumption of negligence on the part of Dr. Fishel or that the burden of proof was upon the plaintiffs to establish negligence by a preponderance of the evidence. Cf. *Ager v. Baltimore Transit Co.,* 213 Md. 414, 132 A. 2d 469.

In view of the conclusions which we have reached with regard to the appellants' contentions, we need not prolong this opinion by discussing the appellee's contention that he was entitled to a directed verdict.

*Judgment affirmed, with costs.*