ALLEN *v.* STATE

[No. 278, September Term, 1963.]

*Decided April 9, 1964.*

The cause was argued before HENDERSON, HAMMOND, PRES-
COTT, HORNEY and SYBERT, JJ.

*A. Samuel Peregoff* for appellant.

*Fred Oken, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Frank H. Newell, III,* and *William P. Bolton, State's Attorney* and *Assistant State's Attorney,* respectively, *for Baltimore County,* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

After appellant was found guilty of murder in the first degree by a jury in the Circuit Court for Baltimore County and sentenced to life imprisonment, he appealed. He had pleaded the general issue plea and "not guilty by reason of insanity."

He raises two questions, but in the view we take of the case, we reach only the first: Was it prejudicial error to permit the witness, Dr. Cushard, to express, under the circumstances, his opinion as to defendant's sanity?

On July 3, 1962, Willard Lee Allen entered the Central District police station in Baltimore City, and informed the police that he had killed one Evelyn Johnson. After investigation established the fact of her death, a fifty-two page sworn statement was given them by the defendant in which he admitted the killing. He was committed to Clifton Perkins State Hospital for observation and remained there for slightly less than two months.

During the trial this statement was introduced by the State, but only a part of it was read to the jury.

The autopsy report indicated that Evelyn Johnson died as a result of a "* * * combination of chloroform, gasoline and carbon monoxide inhalation." The report affirmatively stated that there was no evidence of a criminal assault. Lt. Middleton testified that the defendant told him "* * * they had had sexual relations, that the girl had drank quite a good bit and passed out and at that time he chloroformed her, bound the body," and "placed it in the trunk of the automobile * * *."

Dr. William G. Cushard was then called as an expert witness and, after stating his qualifications, testified that the defendant entered Clifton Perkins Hospital on March 6, 1963, and remained there for a little less than two months. He was seen on admission by one of the staff psychiatrists for an in-

terview to attempt to arrive at a tentative or working diagnosis, and during the remainder of his hospitalization he was under 24 hour observation by nurses and attendants in the hospital. He was later given a complete psychiatric case study including a detailed examination and was interviewed by a social service worker. He received a battery of clinical psychological tests and when all of the information and examinations were completed, the defendant was presented before a medical staff conference, after which each physician gave his opinion regarding the defendant's mental condition. Everyone agreed the appellant was "mentally sick." The doctor further testified: "* * * the purchase of chloroform, the purchase of rope, and all this was preparatory to carrying out the compulsion, not to kill any particular person. I am not even sure that he meant to kill somebody. I think this man's compulsion is to commit what is known as a sadistic act. He has committed sadistic acts before, the inflicting of pain on people. He may have gone a little further than he meant to here. I think his primary purpose, this is my opinion, was to commit pain, to commit a sadistic act on a woman." A report previously submitted to the Court substantiated by Dr. Cushard, indicated that the defendant might not have really been aware of what he was doing at the time, as he might have been "completely amnestic."

In response to a question by defense counsel, the witness stated that neither he nor any one of four other doctors at Clifton Perkins Hospital was willing to state that the defendant was responsible under Maryland law at the time of the alleged criminal act. Thereafter the following colloquy took place:

"[The Court] * * * the Court will ask the doctor a question in lieu of the one that the State's attorney has asked. In your opinion, based on all of your examinations of this defendant, Doctor, did he at the time of the commission of the alleged act, to wit on or about July 1, 1962, did he have the capacity and reason sufficient to enable him to distinguish between right and wrong and to understand the nature and consequence of his act as applied to himself? A. Your honor, may I ask a question? Am I supposed in an-

swering that question to take into consideration *certain things which have been introduced into the trial today?* [Italics ours.]

"[The Court] Yes. A. Which relate to his condition?

"[The Court] I would like to have your answer to that question based on *everything* that you know at this very minute, *based on what you heard today* [italics ours] plus the examination of the defendant. On or about July 1, 1962, did Willard Allen have capacity and reason sufficient to enable him to distinguish between right and wrong and to understand the nature and consequence of his acts as applied to himself?

"[Mr. Feeley] May I ask this, your Honor, may I ask the doctor to answer that question firstly by saying whether he is going to say—

"[The Court] The doctor can answer it whether he has such an opinion, then he can state his opinion, then he can give his reasons for it. I am not trying to interrupt the doctor. I will give you an objection to the Court's question and the objection is overruled. Let's go. A. Based upon *everything* I have learned about this man and up to this date, this minute, I would have to say that I think it is highly probable leaving only just the word possibility in, anything is possible, really but I think it is highly probable on the basis of *everything that I know now* [italics again ours] that he was able to distinguish between right and wrong and understand the nature and consequences of his act."

It is obvious that the question propounded by the judge below was a hypothetical question calling for the opinion of an expert medical witness, based upon a personal examination of the appellant and knowledge that the witness had obtained from other sources. When such knowledge acquired from other sources is properly limited and delineated, the above mode of asking a hypothetical question has been recognized and ap-

proved in this State for many years. *Wolfinger v. Frey,* 223 Md. 184, 162 A. 2d 745, and cases therein cited. And the facts not within the personal knowledge of the expert may be obtained by evidence adduced in a trial that he has heard or read. *Quimby v. Greenhawk,* 166 Md. 335, 171 A. 59; *Ihrie v. Anthony,* 205 Md. 296, 107 A. 2d 104; *Mangione v. Snead,* 173 Md. 33, 49, 195 A. 329; *Wolfinger v. Frey, supra.*

However, it is well settled that, since the inference or conclusion reached by the expert is based upon certain premises or postulates, these must be identified. And, in order that the premises and postulates taken into consideration by the expert may be known and their truth or falsity determined by the court or jury, they must be accurately stated with some particularity. "For this reason the admissibility of a hypothetical question primarily depends upon whether it furnishes the tribunal with the means of knowing upon what premises of fact the conclusion is based [with this problem being left largely in the sound discretion of the trial judge]." *Quimby v. Greenhawk, supra.* See also *Bethlehem Steel Co. v. Munday,* 212 Md. 214, 129 A. 2d 162; *Wolfinger v. Frey, supra.* Also, the question as propounded must not be confusing to the jury, *Thompson v. Phosphate Works,* 178 Md. 305, 319-320, 13 A. 2d 328, and, it cannot be based upon conflicting testimony, heard or read, of a material nature, *State, etc. v. Fishel,* 228 Md. 189, 199, 179 A. 2d 349, unless the witness (or counsel) states the facts assumed to be true as a basis for the conclusion of the witness. *Mangione v. Snead, supra.*

Having in mind the above principles of law, we proceed to consider the propriety of the question as it is set forth above. We shall not determine whether it was based upon conflicting testimony, for it was, we think, faulty in two other aspects; namely that it failed to state the premises upon which it was based with reasonable particularity, and, as presented, it was confusing to the jury.

It will be remembered, as we pointed out above, that the witness was asked to give his expert opinion based on his personal examination and knowledge otherwise obtained. The question, as it finally reached the witness, was so broad that

he was told to base his answer on "certain things" which have been "introduced into the trial today," and "everything you know at this very minute, based on what you heard today plus 'the examination of the defendant." His answer was "based upon everything I have learned about this man and up to this date, this minute." The record extract fails to disclose the portion of the trial attended by the witness, what other witnesses he had heard testify, or what facts he assumed to be true (in addition to those discovered by his personal examination), in changing his mind. In fact, his answer as finally given was so broad that it cannot be said with certainty that it was based solely on his personal examination and the evidence produced at the trial. From the above, it seems clear that the question failed to meet the test of stating the premises upon which it was based with reasonable particularity. This Court, in *Penna. R. Co. v. Lord,* 159 Md. 518, 523, 151 A. 400, held it to be prejudicial error to allow a doctor (who had examined and treated the plaintiff) to express an opinion based upon the testimony of the plaintiff, he having been out of the court room for "a minute or two" while she was testifying. The reason for the rule is aptly stated in *Lake v. People,* 1 Parker Cr. Rep. (N.Y.) 495, 557, as follows: "To allow medical testimony to be given on merely such part of the evidence as they heard, would be as dangerous a principle as to permit a juror to sit during part of a trial and then unite with the rest in rendering a verdict."

We shall not here repeat the question. It will be noted that it is based upon several questions propounded by and to the court, with one question interspersed by defendant's counsel. It was necessary for the jury to know upon what facts the doctor was predicating his answer, for it was essential for the jury to determine the existence, *vel non,* of such facts in order properly to evaluate the weight to be given the answer. The promulgation of hypothetical questions by colloquy between the court and a witness or between counsel and a witness is a risky and unsatisfactory method of asking such questions, because they frequently result in confusing the jury. *Bethlehem Steel Co. v. Munday, supra; Thompson v. Phosphate Works, supra.* In *Thompson,* a doctor was asked a short hypothetical ques-

tion; upon objection, there was a short amendment thereto; and upon further objection, the trial court added another short amendment. This Court held the question to be improper, stating that the manner in which the question was framed—"by successive amendments"—was well calculated to confuse the jury as to what the doctor, in the last analysis, was supposed to answer.

We, therefore, hold that the trial judge abused his discretion in allowing the question, and the answer thereto was prejudicial to the appellant.

*Judgment reversed, and case remanded for a new trial.*