(No. 14033.—Reversed and remanded.)

THE PEOPLE *ex rel.* Edward J. Brundage, Attorney General, Defendant in Error, *vs.* THE HILL TOP METALS MINING COMPANY *et al.*—(A. C. JONES, Plaintiff in Error.)

*Opinion filed December 22, 1921.*

1. TRIAL—*opening statement by the defendant's counsel may amount to an admission.* Facts alleged in the opening statement of the defendant's counsel for the information of the court, when properly preserved in the record and repeated in the statement in the brief filed on review, are binding upon the defendant and his counsel, particularly in a civil suit or in a trial for a misdemeanor; and the court is warranted in acting upon such statement as an admission made by the defendant.

2. SALES—*general rule as to where sales of personal property are completed.* Sales of personal property, whether made to the vendee personally or by letter, are regarded as made at the place where the vendor shows his assent to the proposal by delivering the goods to a carrier for the vendee, in the absence of any agreement of the parties or any special circumstances showing the contrary.

3. SECURITIES—*when conviction for selling stock in violation of Securities act cannot be sustained.* One who receives at his office in Illinois an application for the purchase of promotion shares of

stock in a foreign mining corporation, and forwards the application, together with the purchaser's money, to his employer, who is a stockholder residing outside of Illinois, and who accepts the offer and mails the certificate of stock to the purchaser, is not guilty of selling securities in violation of the Illinois Securities act, as such a sale is made outside the State by the stockholder and not by the defendant.

WRIT OF ERROR to the Municipal Court of Chicago; the Hon. DANIEL P. TRUDE, Judge, presiding.

JAMES E. MCGRATH, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, and JAMES B. SEARCY, (ADA M. CARTWRIGHT, and CHARLES C. BARTLETT, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On a trial in the municipal court of Chicago without a jury, plaintiff in error, A. C. Jones, was found guilty of unlawfully and willfully selling to Edward Ginsberg, for the sum of $300, 150 shares of the capital stock of the Hill Top Metals Mining Company, a corporation organized under the laws of the State of Arizona, and as the agent of that company, the stock and certificates of shares being then and there a security the inherent qualities of which did not then and there assure their sale and disposition without the perpetration of fraud, and the same not being securities then and there based on established but on prospective income, and which were known as securities in class "D" as defined in and under the provisions of an act of the General Assembly entitled "An act relating to the sale or other disposition of securities," etc., approved and in force June 10, 1919, (Laws of 1919, p. 351,) the corporation and Jones not having then and there filed or caused to be filed in the office of the Secretary of State the statements and documents required to be filed by section 9 of said act. The trial

was on an information filed in that court. A jury was formally waived by plaintiff in error and he was fined in the sum of $100 and costs. He has prosecuted this writ of error for the review of the record. No service was had on the defendant corporation.

Plaintiff in error contended in the lower court, and contends here, that the Securities act is invalid and in contravention of the fourteenth amendment of the Federal constitution and the bill of rights of the constitution of Illinois. He further contended in the lower court, and contends in this court, that the evidence fails to show (1) that the stock alleged to have been sold is a class "D" security as defined in the Securities act; and (2) that the evidence fails to show that he sold the stock to Ginsberg.

The facts are, in substance, the following: John O. Fife, of Kansas City, Kansas, and Peter J. Kasper, of Evanston, Illinois, purchased a group of twenty-nine or thirty mining claims in Cochise county, Arizona, and on September 11, 1916, incorporated the Hill Top Metals Mining Company under the laws of Arizona to develop those properties and fixed the capital stock at 10,000,000 shares, of the par value of one dollar per share. They transferred to the corporation all the properties in consideration for all of the capital stock. A mining engineer whom they had previously employed to make a search throughout the western country and Mexico and who had located these properties was to receive under a contract he had with them one-fifth of the stock of the company. They placed in the treasury of the company 2,000,000 shares of the capital stock with the understanding that no part of the treasury stock should be sold until the mine had been developed to a producing point, the same to be later sold for improvement purposes. About 1,000,000 shares were to be paid to the party from whom Fife and Kasper purchased the properties, as a part of the purchase price. Out of the remaining stock they were to sell so much as was necessary

to obtain money for development purposes, and the money obtained by the sales of their joint interests was to be used in developing the mine. After the mine had been developed to a point of producing they were to obtain so much of the stock as had not been sold for development purposes. In the several agreements made between Fife and Kasper, their vendors, the engineer and the corporation, it was agreed that none of the stock which the engineer, Fife and Kasper and their vendors were to receive should be issued until the mine had been developed to a producing point, the purpose of the promoters being to sell their own stock for the development of the property and to prevent large amounts of the stock which the other parties were eventually to receive being sold in competition with the sales of the promotion stock. Fife and Kasper undertook to finance this enterprise in Chicago and vicinity, and sold a large amount of their interests under special agreement that the corporation should issue stock sold by them and charge the same to their joint interests. The stock so sold was the only stock issued by the company, no stock having been sold directly by the corporation.

On January 1, 1918, the first of the acts known as "Blue Sky laws" went into effect in this State, and a license was secured by the company and also licenses for several of its agents were procured to continue the sale of the shares under the plan previously followed. When the Securities act of June 10, 1919, became effective it was impossible for the promoters of the company to continue their financing under the plan they had adopted, as the stock they were selling was in reality promotion stock, and under the provisions of the latter act and the rulings of the Secretary of State promotion stock was required to be placed in escrow and could not be legally sold. The claim of plaintiff in error is that the promoters entirely withdrew from this State and ceased the further sale of stock therein; that he had been the secretary of the company but resigned and no longer acted as

secretary or agent of the company; that the company withdrew wholly from Illinois and established its office in Kansas City, Kansas, at the home of John O. Fife, the president of the company, and that all further sales were made at the office in Kansas City. At the time of such withdrawal there were 1500 or 2000 stockholders residing in Chicago and vicinity, and it is claimed that for the purpose of furnishing these stockholders information as to the properties of the company and the progress of the development work, and such other information as they might desire, Fife at his own expense rented office room 908 in the Otis building, in Chicago, and employed plaintiff in error to represent him in the furnishing of such information to the stockholders of Chicago and vicinity.

In July, 1920, Joseph E. Temple, a resident of Chicago and a stockholder in said company, went to Arizona and spent about nine days at the mine. Upon his return he met the complaining witness, Edward Ginsberg, with whom he had been acquainted for several years, and informed him of his visit to the mining properties, and said he thought the stock would prove a very profitable investment and advised Ginsberg to purchase shares of it. After several conversations with Temple, Ginsberg decided to invest $300 in the stock of the corporation and went with Temple to the Otis building to see plaintiff in error in regard to the purchase of the stock. According to the contention of plaintiff in error he informed Ginsberg that he had no stock for sale; that no stock was for sale in Chicago; that the company had not taken steps necessary to authorize the sale of its securities in Illinois under the Blue Sky law; that Ginsberg could purchase shares of such stock only by forwarding to John O. Fife, at Kansas City, a written application for stock, with the purchase price at which Fife was then selling his individual stock, and that Fife, on such application, would mail to Ginsberg his stock on acceptance of his offer or application. Ginsberg testified that when he

went to plaintiff in error's office he was asked by him if he knew all the details of the company and if he was interested, and that Ginsberg replied, "I guess so," and that Temple had told him everything. Plaintiff in error then furnished Ginsberg with a form of application, which the latter signed. The application was dated July 27, 1920, and was in form a letter addressed to Fife at his residence in Kansas City and was signed by Ginsberg, and after the latter's name appeared his residence address in Chicago. The letter is in this language:

"I am informed that the Hill Top Metals Mining Company will not sell any of its treasury stock but that possibly you will dispose of some of your individual holdings. I therefore write to offer you $300 for 150 shares of your individual stock in said company and enclose check for said amount. If accepted, please assign and cause to be issued in my name a certificate for the said number of shares. This offer is made on the further understanding and agreement that I will not sell or transfer said shares, and that said shares will not be transferred on the books of the Hill Top Metals Mining Company until J. O. Fife ceases selling (and also P. J. Kasper, if he should resume selling,) his individual shares and voluntarily devoting the proceeds thereof to paying expenses and development work upon the properties of the Hill Top Metals Mining Company."

After Ginsberg's signature and address, in the left margin of the application, appeared the following, signed by Fife: "Aug. 5, 1920, accepted.—Recd. $300.—Issued cert. for 150 shares."

Ginsberg received his certificate for 150 shares of said stock from Fife by mail about two weeks after he signed and mailed his application therefor. At the time he signed and mailed his application Jones asked him for his personal check to Fife to mail with the application. On being informed by Ginsberg that he had no check and that the banks were all closed and that he had brought $300 in cash with

him to pay for the certificate, Jones suggested to him that he would take the money and send his own personal check to Fife, as it was not safe to send money in the letter. Jones took the $300 from Ginsberg, deposited it in the bank in his own private account, drew his check on the bank, mailed the check for Ginsberg to Fife along with Ginsberg's application, and then gave Ginsberg a receipt for the money. Ginsberg testified positively that Temple was the man who induced him to buy this stock and that Jones did not directly have anything to do with having him buy, but he also stated that Jones told him that he would get the stock from Kansas City by mail and that he would never regret buying it, and that it would be worth twenty times as much as he paid for it; also, that Temple told him, in Jones' presence, that the company was not thoroughly in operation; that they had not shipped anything out for something like a year or so; that it was almost complete, and as soon as they put it on the New York curb it would begin paying dividends and that it would go up from twenty to thirty times what he paid for it.

The facts further disclose that forms for application to Fife for the purchase of stock from him were kept by Jones in the office conducted by him for Fife for prospective purchasers to make applications for stock, being the same in form as signed by Ginsberg. Jones testified that when he "scared up a sale for Fife" he generally received a commission from him on the sale, although there was no positive contract to that effect; that he thinks he got a commission on the sale to Ginsberg, and that he made about $150 per month as agent for Fife. It was also positively stated by counsel for Jones as facts to be considered by the court, that the stock which Fife was selling was really promotion stock, and that under the ruling of the State department, and under section 12 of the Securities act, such stock must be held in escrow, and that the stock was not in escrow, and that they could not sell it and it could not be sold in

this State. Again, in speaking of the stock being sold by
Fife, in his statement of facts to the court counsel used this
language: "But under the Securities act that stock * * *
is promotion stock, and promotion stock must be put in es-
crow and cannot be sold. That is the very stock they were
selling. When they couldn't qualify under the Securities
act they simply had to cease doing business in Illinois.
They closed up their office. Mr. Jones, who had been sec-
retary of the company, was removed or resigned. They
moved their office to Kansas City, Kansas, and stopped sell-
ing stock in Illinois. But numbers of the stockholders in
this company were satisfied. Some of them still think it a
pretty good thing. They bought other stock from Fife, and
that is why anybody who wants to buy stock must make
application to Mr. J. O. Fife, of Kansas City, Kansas."

On the trial of this case, after the People had introduced
their evidence and after counsel for plaintiff in error had
introduced the evidence of one witness, his counsel stated to
the court and for the information of counsel for the State
a considerable portion of the facts that appear in our fore-
going statement. The statement of facts by counsel for
plaintiff in error was incorporated into the record and has
been abstracted, and he has made that same statement a
part of his statement of the facts to this court. When such
statements are made by counsel in their opening statement
of the case for the information of the court and are prop-
erly preserved in the record, as they are in this case, they
are binding upon the defendant and his counsel, and par-
ticularly in a civil suit or in the trial of a defendant for a
misdemeanor, and the court is warranted in acting on such
statements as admissions made by the defendant. (*Oscan-
yan* v. *Arms Co.* 103 U. S. 261; *Pratt* v. *Conway*, 148 Mo.
291; *Lindley* v. *Atchison, Topeka and Santa Fe Railroad
Co.* 47 Kan. 432.) In the first case above cited, Justice
Field, who pronounced the judgment of the court, said that
"the power of the court to act in the disposition of a trial

upon facts conceded by counsel is as plain as its power to act upon the evidence produced."

The Illinois Securities law divides securities, for the purposes of the act, into four classes: (1) Securities the inherent qualities of which assure their sale and disposition without the perpetration of fraud, and are designated as securities in class "A;" (2) securities the inherent qualities of which, or in the nature of one or both parties to the sale thereof, assure their sale and disposition without the perpetration of fraud, and are designated as securities in class "B;" (3) securities based on established income, and are designated as securities in class "C;" (4) securities based on prospective income, and are designated as securities in class "D."

Securities in class "A" and class "B" are not subject to the provisions of the act when sold in compliance therewith, and need not be further discussed or considered for the purposes of this decision.

Securities in class "C" comprise the following: "Those issued by a person, corporation, firm, trust, partnership or association owning a property, business or industry, which has been in continuous operation not less than two years and which has shown net profits, exclusive of all prior charges, as follows: (1) In the case of interest-bearing securities not less than one and one-half times the annual interest charge upon all outstanding interest-bearing obligations; (2) in the case of preferred stock not less than one and one-half times the annual dividend on such preferred stock; (3) in the case of common stock not less than three per cent per annum upon such common stock." Securities in class "C" may be sold upon filing a statement in the office of the Secretary of State, verified by the oath of not less than three credible persons having knowledge of the facts, giving all of the evidence and facts required by section 7 of the Securities act, and at the same time filing not less than twenty-five copies of such statement, wholly printed

or typewritten, with the Secretary of State, the printed or typewritten copy to contain at the top, in bold-face type, the expression, "Securities in class 'C' under Illinois Securities law," followed by the expression, in bold-face type: "This statement is prepared by parties interested in the sale of securities herein. Neither the State of Illinois, nor any officer of the State, assumes any responsibility for any statement contained herein nor recommends any of the securities described below."

All securities other than those falling within classes "A," "B" and "C," respectively, shall be known as securities in class "D." Section 9 of the Securities act provides that no security in class "D" shall be sold or offered for sale until there shall have been filed in the office of the Secretary of State the statement and documents required in section 9, and not less than twenty-five printed or typewritten copies of the summary of the statement required to be filed with reference to such securities shall be deposited in the office of the Secretary of State, which copies shall bear at their tops, in bold-face type, the expression, "Securities in class 'D' under Illinois Securities law. These are speculative securities," followed by the expression, also in bold-face type: "This statement is prepared by parties interested in the sale of securities herein mentioned. Neither the State of Illinois nor any officer of the State assumes any responsibility for any statement contained herein nor recommends any of the securities described below." The requirements of section 9 are much more rigid than the requirements of section 7 for the sale of securities in class "C," as will be found by an examination of those two sections.

The facts stipulated and proved show clearly that the securities in question purchased by Ginsberg were based on prospective income and belong to the class referred to in the statute as speculative securities or class "D" securities, and it requires no argument or further statement to demonstrate that fact. Not only is this true, but the facts also

show that plaintiff in error and the corporation and its officers had not complied with the requirements of the act to entitle them to sell said securities or have them sold in Illinois. The admissions were to the effect that the stock in question was promotion stock, and was required by the act to be put up in escrow and could not legally be sold until qualified under class "C." There is no such provision as to any stock except as to class "D" stock, and the provision as to promotion stock is found in section 12 of the act. The statement of counsel was an admission, also, that the stock in question could not then be legally sold, and that it was for this reason that the company had to quit Illinois and quit selling stock therein and move to Kansas for the purpose of making further sales of the stock. The contention of plaintiff in error, therefore, that the record does not sustain the finding that the securities in question are class "D" securities and that their sale in Illinois was and is illegal is not tenable.

The contention of plaintiff in error that the securities in question were not sold by him and that the sale was not made in Illinois must be sustained. Under the evidence in this case the sale was not completed or made until the securities were mailed to Ginsberg by Fife at Kansas City, and the sale must be held to be a sale at Kansas City. Sales of personal property, whether made to the vendee personally or ordered by letter, are regarded as made at the place where the vendor shows his assent to the proposal by delivering the goods to a carrier for the vendee, in the absence of any agreement of the parties or any special circumstances showing to the contrary. In *People* v. *Young,* 237 Ill. 196, a party in Georgetown ordered beer from a saloon-keeper in Danville by telephone, who filled the order by delivering the beer to an express company in Danville, which delivered it to the party at Georgetown on his paying the express company for the beer, and the court held that the sale was a sale at Danville and not at Georgetown.

In *City of Carthage* v. *Duvall,* 202 Ill. 234, it was held that where a gallon of whisky was ordered by one Skidmore, living in Carthage, Illinois, from a liquor dealer in Burlington, Iowa, and the liquor dealer filled the order by delivering the whisky to an express company at Burlington consigned to Skidmore at Carthage, C. O. D., which was delivered by the express company on payment of the money by the vendee, the sale was a sale at Burlington and not at Carthage.

In *Sarbecker* v. *State,* 68 Wis. 171, it was held by the Supreme Court of Wisconsin that where the contract is silent on the subject and there is nothing in the transaction indicating a different intention, and a manufacturer residing in one city receives through his agent residing in another city an order for beer from a customer there and fills the order by delivering the beer to a common carrier at the place of manufacture, consigned to the customer at his place of residence or to such agent for him, the sale is complete and the title passes at the place of shipment, even though the customer, on receiving the beer at his place of residence, pays to such agent the purchase price, and that the absence of a license to sell liquor in the county where the purchaser resided will not render the agent liable for selling without there obtaining a license.

In *Dunn* v. *State,* 82 Ga. 27, the Supreme Court of Georgia said that if the evidence left it doubtful whether delivery was to be made to the carrier at the place where the seller did business or to the buyer where the purchaser resided, "we answer that where two methods of delivery are open,—one legal, the other illegal,—the former is to be considered as the one contemplated, unless the parties by express agreement have adopted the other. Certainly is this true where the one would be innocent and the other illegal."

The case of *Phœnix Packing Co.* v. *Humphrey-Ball Co.* 58 Wash. 396, cited by defendant in error, does not con-

travene but is in harmony with the rule laid down in the cases above cited. In that case the undisputed testimony was that under the terms of the contract the goods were to be considered the goods of the seller until they were purchased and paid for in Spokane by respondent or vendee. It was therefore held that the place of delivery was at Spokane, the residence of the vendee, as the goods, by agreement, were at all times the property of the vendor until they should actually be delivered to the vendee in Spokane and paid for by him. In the case in hand the title to the securities was not to pass to Ginsberg, and did not pass to him, until the contract was accepted by Fife and the securities were mailed by him. The sale was therefore made at Kansas City and not at Chicago.

The conviction in this case was for an unlawful sale of the securities in question as the agent of the corporation, and that was the charge in a single-count information. Plaintiff in error was the agent of Fife and not of the corporation and was not guilty of a sale in Illinois. Section 29 of said statute makes it a misdemeanor for any solicitor, agent or broker to sell or to offer to sell any securities in class "D" without complying with the provisions of the statute. Had a proper count been added for unlawfully offering the certificates in question for sale there would have been a different question presented for decision; but the conviction in this case for a sale cannot be sustained for the reasons aforesaid, and that conclusion finally settles all questions raised on this record. It is therefore not necessary to pass upon any constitutional question raised by plaintiff in error.

The judgment of the municipal court is reversed and the cause is remanded.    *Reversed and remanded.*