ANNA M. RAITT, ET VIR *v.* JOHNS HOPKINS
HOSPITAL ET AL.

[No. 929, September Term, 1973.]

*Decided July 19, 1974.*

The cause was argued before ORTH, C. J., and MOYLAN and MENCHINE, JJ.

*Marvin Ellin,* with whom was *Leonard Passano Baker, Jr.,* on the brief, for appellants.

*Hugh E. Donovan* and *William A. Ehrmantraut* for appellee, The Johns Hopkins Hospital. *John F. King*, with whom was *Ward B. Coe, III*, on the brief, for other appellee.

ORTH, C. J., delivered the opinion of the Court.

On 31 August 1972 ANNA M. RAITT and HERMAN J. RAITT, her husband, appellants, filed a tort action in the Baltimore City Court against THE JOHNS HOPKINS HOSPITAL and ANDREW C. W. MONTAGUE, M.D., appellees. The basis of the suit was medical malpractice. On 19 October appellees pleaded the general issue. On 17 November, at the suggestion of appellees, the case was removed to the Circuit Court for Montgomery County. Maryland Rule 542. On 20 January 1974 it came on for trial before a jury, and, at the close of the evidence offered by appellants, the court granted appellees' motion for a directed verdict. Rule 552. On 4 February judgment was entered in favor of appellees for costs. Appellants noted an appeal the next day.

## THE LAW RELATING TO MEDICAL MALPRACTICE

### (1)

A physician is presumed to have performed his medical duties with care and skill. *State, Use of Janney v. Housekeeper*, 70 Md. 162. See *Fink v. Steele*, 166 Md. 354; *McClees v. Cohen*, 158 Md. 60. The presumption is rebuttable, and the failure to exercise requisite care or skill is tortious in nature. *Benson v. Mays*, 245 Md. 632. The want of the requisite care or skill in the performance of medical duties being negligent, a physician is liable for injuries directly caused thereby. The doctrine of *res ipsa loquitur* does not apply to medical malpractice, and the mere fact that an unsuccessful result follows medical treatment is not of itself evidence of negligence. *Johns Hopkins Hospital v. Genda*, 255 Md. 616; *Bettigole v. Diener*, 210 Md. 537. See *Nolan v. Dillon*, 261 Md. 516; *Lane v. Calvert*, 215 Md. 457. Therefore, the aggrieved party must show both a lack of the requisite care or skill on the part of the physician and that such want of care or skill was a direct cause of the injury; if

proof of either of these elements is lacking the case is not a proper one for submission to the jury. *State, Use of Kalives v. Baltimore Eye, Ear and Throat Hospital,* 177 Md. 517; *Angulo v. Hallar,* 137 Md. 227. The issue of professional care or skill ". . . is generally a topic calling for expert testimony only . . . ." *Fink v. Steele, supra,* at 361, quoting *Wigmore on Evidence* (2d Ed.), § 2090; *Thomas v. Corso,* 265 Md. 84, 97.[1] Thus, it is necessary that parameters be established through which the standard of care or skill may be expressed. We find these parameters clearly established in Maryland. The performance of the professional duties of a physician-defendant is tested by the amount of care or skill exercised generally by physicians engaged in the same field or specialty at the same time in the locality or community in which the physician-defendant was practicing. *State, Use of Solomon v. Fishel,* 228 Md. 189, 195. We summed it all up in *Dunham v. Elder,* 18 Md. App. 360, 363:

> "In proving a malpractice case in Maryland, a plaintiff has the burden of proving: (1) the standard of medical skill and care ordinarily exercised in the particular locality; (2) a failure to observe that standard on the part of the physician-defendant; and (3) a showing that the defendant's failure to observe the proper standard was a direct cause of the injuries about which his patient complains in the malpractice action."

(2)

It is *Dunham* which gives rise to the primary issue on this appeal. The parties seem satisfied that the established law in Maryland is that the care or skill of the physician-defendant is to be measured against the amount

---

1. The Court in *Fink*, at 361, noted that there may be cases in which there is such gross negligence and unskillfulness as to dispense with professional witnesses. In *Central Cab Co. v. Clarke*, 259 Md. 542, 551-552, the Court quoted *Butts v. Watts*, 290 S.W.2d 777 (Ky. 1956) with approval: "There is a limitation on the rule that expert testimony is essential to support a cause of action for malpractice where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts." See *Thomas v. Corso, supra; Johns Hopkins Hospital v. Genda, supra; McClees v. Cohen, supra.*

of care or skill exercised generally by physicians engaged in the same field in the community in which the physician-defendant performed the duties alleged to be improper. They accept that *Dunham* did not change the existing rule; that the physician-defendant's conduct is to be measured against the standard of care or skill in the defendant's own community.[2] But where they are at odds is with respect to the qualifications of the expert witness who may testify with respect to that standard. Appellants say that what is required is that the expert be familiar with the local standard. Appellees claim that the teaching of *Dunham* is that the expert must have gained his knowledge by practicing or residing in the community involved. The trial court also so construed *Dunham*.[3] *Dunham* does not so hold.

---

**2.** Appellants urge, however, that we adopt a less restrictive test. In some jurisdictions, as we pointed out in *Dunham*, the applicable standard of care is not tied to any particular geographic locality. In other jurisdictions the standard of medical skill or care required is not merely that of physicians and surgeons practicing in the defendant's own community, but rather the standard adhered to by physicians and surgeons of ordinary skill and care in either the defendant's community *or* in a similar community. We indicated that were the matter one of first impression we might be persuaded to adopt a more liberal test, but that we were not going to depart from the standard firmly established in Maryland. 18 Md. App. at 363-365. We are still of the same mind.

**3.** In finding that none of the witnesses offered by appellants qualified as experts to give an opinion with respect to the standards of care of a physician in Baltimore City performing the particular surgical procedure involved, the trial judge said: "I am going to hold that Dunham versus Elder controls . . . ." He explained:

"It is contended by the Plaintiff in the case before us that our case can be distinguished from Dunham versus Elder and that the fact that Dr. Klavan and the other doctors which we have mentioned [proffered by appellants as experts] are Board-certified and have discussed gynecological problems with other doctors from Maryland and are generally familiar with the procedure in question should qualify them to offer expert opinions as to the standards of care possessed and exercised by the physicians in the Defendant's own community; that is, Baltimore City, even though none of the medical witnesses whose testimony has been offered by the Plaintiffs has ever practiced in Maryland, has ever treated patients in Maryland as practicing physicians, nor have they ever enjoyed any privilege in any hospital in Maryland, nor do they maintain offices in Maryland.

Now, in the Dunham case these were the tests mentioned and the trial Judge's refusal to permit Dr. Derrick to testify was affirmed by the Court of Special Appeals, which cited the fact that Dr. Derrick had never practiced in Maryland, had never treated

In *State, Use of Janney v. Housekeeper, supra,* at 172, the Court found no error in the grant of a prayer which told the jury that ". . . the degree of care and skill required is that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients . . . ." In *Dashiell v. Griffith,* 84 Md. 363, 380-381, the Court observed: "The cases are generally agreed upon the proposition, that the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally." But the trial court had granted a prayer which told the jury that if they ". . . find from the evidence that . . . said amputation [of plaintiff's finger] was rendered necessary by the want of such reasonable skill, care and diligence in the treatment of said finger and of the said plaintiff, as is usually exercised by physicians and surgeons in good standing in the defendant's school of practice *in this locality,* then their verdict must be for the plaintiff." At 364 (emphasis supplied).[4] In any event, in *State, Use of Solomon v. Fishel, supra,* the Court explicitly impressed the locality restriction on the degree of care and skill test, stating, at 195: "The first question then with regard to the defendant's liability is whether or not he did fail to exercise the amount of care, skill and diligence as a physician and surgeon which is exercised generally in the community (the City of

patients in Maryland and never enjoyed privileges in any hospital in Maryland and never maintained an office in Maryland."

Appellants' counsel asked if the reason for the ruling was that the witnesses "do not live in or practice in the community involved; is that correct?" The court replied: "For the reasons I have stated."

4. In *The Wisdom of the Strict Locality Rule,* by John F. King and Ward B. Coe, III, 3 University of Baltimore L. Rev. 221, 226, it is suggested that the Court in *Dashiell* "stated that permitting expert opinion, contrary to the traditional rule [disfavoring expert opinion as a departure from the common law tradition of testimonial knowledge], would be less objectionable if strictly construed by inclusion of a local standard charge," concluding: "Thus, by 1896, strict locality was the recognized rule in this State." We do not believe the Court in *Dashiell* went that far. It did say, at 378: "The rule allowing expert evidence will, in our opinion, be less objectionable and more conducive to justice if it be somewhat restricted, rather than relaxed," but this was said in the frame of reference of the qualifications of a witness as an expert rather than with respect to a limitation on the rule concerning the requisite care and skill of a doctor in the performance of his duties.

Baltimore) in which he was practicing by doctors engaged in the same field.[5] See *Lane v. Calvert*, 215 Md. 457, 462, 138 A. 2d 902, and cases therein cited." [6]

We find no departure by the Court of Appeals from the *Fishel* qualification to the *Housekeeper* standard. The qualification was expressly affirmed in subsequent cases. For example, in *Tempchin v. Sampson*, 262 Md. 156, stating that the liability of an optometrist to a patient is to be tested by standards analogous to those used to test physicians and surgeons, the Court used the *Fishel* language in expressing the standard — "whether or not he did fail to exercise the amount of care, skill and diligence as [an optometrist] which is exercised generally in the community . . . in which he was practicing by [other practitioners] in the same field." At 159. In *Thomas v. Corso, supra*, at 97, the Court observed that ". . . in many medical malpractice cases expert testimony is required to be introduced by the plaintiff to establish the standard of care in the locality involved . . . ." In *Kruszewski v. Holz*, 265 Md. 434, 438, the Court said: "At trial both sides agreed, as they should, that Dr. Holz was required to adhere to the same standard of care in treating his patients as was practiced by other physicians engaged in this specialty in the community." In those cases in which the locality qualification was not expressly included in stating the test, it appears that the standard was in fact applied in terms of the locality or community or that locality was not an issue. So in *Nolan v. Dillon, supra*, where, although the degree of care and skill was set out in the words of *Dashiell v.*

---

5. In *Fishel* the medical duties were performed in the City of Baltimore. The Court made clear by its parenthetical reference to the City of Baltimore that "community" in those circumstances meant the City.

6. In *The Law of Medical Malpractice in Maryland: A Plaintiff's Dilemma*, by Marvin Ellin, 3 University of Baltimore L. Rev. 207, issue is taken with the citation of *Lane* as authority for the standard enunciated. Pointing out that the Court in *Lane* did not place a geographical limitation on the evaluation of a physician's degree of care or skill, Mr. Ellin concludes, at 209, note 14: "This failure by the *Lane* court to place such a strict locality limitation upon the plaintiff in a medical malpractice suit makes the *Fishel* court's addition to the Maryland medical malpractice standard, allegedly based on *Lane*, of highly dubious validity. See *Nolan v. Dillon*, 261 Md. 516 . . . ." He concedes, however, that "This qualification to the *Housekeeper* standard has become stare decisis in Maryland." At 209-210.

*Griffith, supra,*[7] the expert testified that the medical treatment by the defendant-physician, who practiced in Montgomery County, was ". . . not in conformity with the usual standard of skill and care ordinarily exercised by a physician specializing in obstetrics and gynecology, practicing in Montgomery County." 261 Md. at 535.

*Dunham* is not to be read as other than following the rule firmly established by the Court of Appeals. When we pointed out in *Dunham* that the experts offered had never been licensed to practice in Maryland, and had never practiced in this State, treated patients, enjoyed privileges in any hospital in Maryland or maintained an office here, we were not impressing additional requirements on the qualifications required by an expert to testify on the matter of local care or skill. We were merely noting the background of the physicians involved; we were not holding that they could not be familiar with the standard of care or skill in the community unless they were licensed to practice in Maryland, and actually practiced, treated patients, maintained an office, and enjoyed hospital privileges in the locality. If the evidence is sufficient to show fairly to the reasonable satisfaction of the trial judge that the expert witness proffered is familiar with the local standard concerned, that witness, otherwise qualified, may testify as an expert with respect to the standard.

We hold that the trial court, in ruling that the witnesses offered by appellants were not qualified as experts to give an opinion with respect to the standards of care of a physician in Baltimore City performing the particular surgical procedure involved, was wrong insofar as its ruling was based upon the fact that the witnesses proffered did not practice in the community in which the alleged negligent treatment occurred.

7. " . . . the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally." *Dashiell* at 380, quoted in *Nolan* at 534.

## THE INSTANT CASE

### The Allegations

The background of the suit as set out in the declaration instituting the action was that on 15 May 1972 Mrs. Raitt was confined as an outpatient of The Johns Hopkins Hospital by Dr. Montague for the purpose of undergoing a laparoscopy tubal ligation. After the operation she was in the care of hospital personnel, Dr. Montague not being present. She was in severe pain but was assured she was free to leave the Hospital the same day. She complained to various physicians and nurses that she was unable to leave because of the intensity of the abdominal pain but was assured by duly authorized employees of the hospital that her complaints were usual and customary after being subjected to the procedure she had just received. Her departure was "against her wishes and in spite of symptoms and a physical condition suggestive of serious injury suffered during what was to have been a routine tubal ligation." The pain persisted and she was returned to the hospital in the late afternoon of 16 May. It was determined that "as a direct result of the attempted laparoscopy and tubal ligation," she sustained "a perforation into the small intestine with resulting infectious process spreading throughout her body." She declared that appellees were negligent in perforating the bowel, in not recognizing during the operation that the intestine had been perforated, and in failing promptly to repair the perforation. She alleged that the negligence was the failure "to exercise the usual standard of medical, surgical and hospital care exercised in the Baltimore community or indeed in the community of any large city in the United States." On 17 May 1972 she underwent surgery to repair injury to the bowel, a portion of which had to be excised because of internal infectious process caused by the prior damage to it. She suffered from an overwhelming septic condition and from collapse of both lungs and developed blood clots which entered her lungs. She was confined in the hospital from 16 May to 24 June 1972. On 7 July 1972 she returned to the hospital because of the development of possible blood clots in her left leg and was

caused to take a medication to thin the blood. Because of continuing deterioration of her health, she was confined at Temple University Hospital for study and treatment, and was released under a rigid adjustment of medications and schedule for daily living in order to control and prevent a worsening of her internal condition. She claimed $800,000 damages. Her husband claimed $100,000 damages for losses incurred and to be incurred as a direct consequence of the negligence of appellees.

*The Evidence*

After opening statements of counsel, the outpatient record of Mrs. Raitt of 15 May 1972, her hospital chart "for various confinements from May 16, 1972 to June 22, 1972 and from July 4, 1972 to July 12, 1972" and the X-rays of her for the period 16 May to 7 July 1972 were received in evidence. They are not included in the record submitted to us. Appellants called Marshall Klavan, M.D. as an expert witness. He was examined as to his qualifications to render an opinion with respect to the community standard of care or skill in the field involved in the treatment of Mrs. Raitt. Proffer was made as to the qualifications of other medical witnesses proposed to testify on the issue. When the court indicated it would find them not qualified, counsel said:

> "May it please the Court, in view of Your Honor's indication that you are entertaining a ruling ... that Dunham v. Elder would effectively keep out from testimony the expert opinion as to the standard of care of Dr. Klavan and Dr. Rodman, who is also from Pennsylvania, and Dr. Maurice Brown, also from Pennsylvania, then I make this proffer as to all three witnesses:
>
> > "Dr. Klavan has already established his credentials as to his expertise. I have already indicated at the bench that the proffer would be that in addition to his certification by a Board which gives national certifying tests,

and one and the same organization which certified the Defendant in this case, Dr. Montague, that the proffer will be as to each and every expert that the Plaintiff intended to call; Dr. Klavan; Dr. Theodore Rodman, Associate Professor of Internal Medicine at Temple University; Dr. Maurice Brown, who has instructed in obstetrics and gynecology and is also a Board-certified obstetrician and gynecologist, that the standards of care in Maryland and, specifically, the Baltimore community on May 15th, 1972 with regard to the giving of a laparoscopy for tubal ligation and the subsequent follow-up care that there is no difference in the standard of care, be it Baltimore, New York, Philadelphia or the West Coast.

"The testimony will be revealed through these witnesses, and it is so proffered, that they will testify that each of them have treated patients from the Baltimore area over a period of years, have of necessity had to secure hospital charts in connection with such treatment of such patients.

"I omitted one doctor who was intended to be called, Dr. Richard Chodoff, and he goes along with this proffer. Dr. Chodoff is a former instructor in surgery at the Medical College of Pennsylvania and he had his internship in Baltimore and he will so testify that the medical care in the repair of a hole in the ileum such as in this case, that the standard of treating such injury, the surgical care and the medical care, follow-up is no different than it would be in Philadelphia or any other large city.

"Further, all of these witnesses will testify to a knowledge of the standard of care that existed in the Baltimore community on May

15th, 1972, although they didn't practice here, being familiar with such standards of care by having treated patients from the Baltimore area, having reviewed their hospital charts and in some instances discussing the care with a prior Maryland physician, having attended meetings where physicians from Baltimore attended such meetings, reading publications distributed nationally dealing with the subject matter.

"But, Your Honor, in this particular case, as this is a traumatic injury to the bowel caused by an inadvertent burning of the bowel by an electrical device, that the standard of care that existed in Baltimore and, indeed, in Philadelphia was that one does not anticipate such an injury, and that having injured such a person the standard of care in repairing the bowel is done immediately, not 36 hours later.

"That certain medications are given as a matter of basic medical knowledge; and

"That such standards are not differing.

"Now, in other words, Your Honor, that in substance is what all of my experts would say.

"First, they will testify to an awareness of what the standard of care in this community was on May 15th, 1972;

"Second, where there was a breach of such standard of care by the Defendant in this case; and

"Three, that such negligence of the standard of care was based upon practical knowledge gained in the practice of medicine, not theoretically, but actually."

No other evidence was offered or proffered by appellants. After the court ruled that the proposed witnesses were not qualified to testify as to the community standard of care or

skill, appellants rested their case. Whereupon each appellee moved for a directed verdict and each motion was granted.[8]

Although appellants ask only whether the trial judge committed error in refusing to permit their "medical experts to testify on the question of 'standard of care'", the resolution of this appeal depends upon the propriety of the grant of the directed verdict in favor of appellees. Because the judge erred, as we have held, in finding that the appellants' expert witnesses were not qualified to testify on the question of standard of care because they did not practice in Baltimore City, it does not necessarily follow that the direction of the verdict was improper as to each appellee. As we have indicated, the Court of Appeals has made abundantly clear that the evidence must ". . . show both a lack of the requisite skill or care on the part of the doctor and that such want of skill or care was a direct cause of the injury; and if proof of either of these elements is wanting the case is not a proper one for submission to the jury." *Lane v. Calvert, supra,* at 462. So we look to the evidence before the court at the time of the grant of the motions, and in deciding whether the motions for a directed verdict in favor of appellees were properly granted, we consider that evidence, together with all reasonable inferences which may be drawn therefrom, in a light most favorable to appellants.

---

8. The transcript reads:

"MR. ELLIN [Counsel for Appellants]: The Plaintiff would rest, in view of Your Honor's ruling.

THE COURT: The Plaintiff must rest before a motion for directed verdict would be in order.

MR. ELLIN: I am responding to the Court's ruling of barring my witnesses from testifying, so that the Plaintiff must rest. It is unable to go forward with this particular witness.

THE COURT: I am not barring your witnesses from testifying. I am simply saying that in my opinion none of your proposed witnesses can qualify as experts to offer an opinion upon the standards of care of a doctor in Baltimore City performing this particular surgical procedure.

MR. ELLIN: That is what the case is about, so the Plaintiff rests.

MR. KING [Attorney for Dr. Montague]: I move for a directed verdict.

MR. DONOVAN [Attorney for The Johns Hopkins Hospital]: I move for a directed verdict, Your Honor.

THE COURT: I grant the motion for directed verdict."

*Summit Loans Inc. v. Pecola,* 265 Md. 43; *Beach v. Woodward & Lothrop, Inc.,* 18 Md. App. 645.

As far as the directed verdicts were concerned, we assume *arguendo* that the first element of proof to be met by appellants, that is that there was a lack of the requisite skill or care,[9] was *prima facie* established by the proffer of the testimony of their proposed witnesses. We have found that the judge was wrong with respect to his reason for holding that the witnesses were not qualified to testify on the issue, and, therefore, as to that element of the required proof, he erred in granting the motions. But it was incumbent upon appellants to prove also that such want of skill or care was a direct cause of the injury. *Johns Hopkins Hospital v. Genda, supra; State, Use of Kalives v. Baltimore Eye, Ear and Throat Hospital, supra; State, Use of Janney v. Housekeeper, supra.* The proffer did not encompass this second element, nor was there other evidence offered by appellants sufficient to establish it.[10] The rule is that if either of the elements is wanting the case is not a proper one for submission to the jury.

## OPENING STATEMENTS AS EVIDENCE

In oral argument before us, appellants suggested that proof of a direct causal connection between the breach of the requisite standard of care or skill and the injury alleged was supplied by the opening statements of appellees' counsel. Counsel for the Hospital touched on the point in its brief, denying that his opening statement replaced the requirement that substantive evidence be produced at trial.

### The Law

The fundamental purpose of an opening statement is ". . .

---

9. The rules of law relating to malpractice are usually stated in terms of the physician-defendant. The same rules apply to other "persons", such as hospitals, charged with negligence in the performance of duties of a medical nature, or of treatment and care of the ill or injured. We assume for the purpose of decision, but do not decide, that the proffer made by appellants went to the requisite skill or care on the part of the hospital as well as the physician.

10. The hospital charts and X-rays would not be sufficient to so show without expert interpretation.

to acquaint the judge and jury with the *facts* that counsel hopes and expects to prove . . . ." *Hartman v. Meadows*, 243 Md. 158, 162. The Court made this statement in distinguishing an opening statement from argument, cautioning that counsel, in the ardor of advocacy, should not change the function of an opening statement into an opening argument, but should leave "the arguments until their proper time, later." *Idem. McLhinney v. Lansdell Corp. of Md.*, 254 Md. 7, 12-13, pointed out, however, that in *Hartman* ". . . nothing was stated to indicate that its *sole* purpose was merely to make the judge and jury better informed about what counsel intended to prove." The Court explained, at 13:

> "And further, to say that 'an opening statement is not evidence' is misleading. It is correct insofar as statements made in an attorney's opening comments cannot replace the requirement that substantive evidence be produced during the trial to establish counsel's theory of the case. However, this phrase should not be interpreted to mean that an attorney, acting as his client's agent within the scope of his authority should not be able to make admissions favorable to the opposing side. 'They [admissions of counsel] may dispense with proof of facts for which witnesses would otherwise be called . . . Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure, equally as if established by the clearest proof . . . .' *Oscanyan v. Arms Co.*, 103 U. S. 261. As stated in 7 C.J.S. Attorney and Client § 100 b (1937):
>
> > 'An attorney employed to prosecute or defend a particular cause is usually held to have the implied power to bind his client by statements and admissions in the pleadings, or *in the opening statement;* or by any admission or statement of fact deliberately made in good faith in open court during the progress of the case for the purpose of dispensing with testimony or facilitating the trial of the cause,

unless the admission or statement is one which is expressly required by statute to be made or signed by the client personally.' (Emphasis added.)

E. g., *Clark & Wilson Lumber Co. v. McAllister*, 101 F. 2d 709 (9th Cir.); *The People v. Hill Top Mining Co.*, 300 Ill. 564, 133 N. E. 303; *Bayer v. American Mutual Casualty Co.*, 359 S.W.2d 748 (Mo.)."

See *Goff v. Richards*, 19 Md. App. 250, 252. Cf. *White v. State*, 11 Md. App. 423. *McLhinney* established that in Maryland a party is bound by his attorney's admissions in an opening statement. *Vernon v. Aubinoe*, 259 Md. 159, 166.[11] The question in a given case, as it is here, is whether what counsel said in his opening statement amounted to an admission so as to waive the presentation of evidence relating thereto.

Recognizing that an admission made in the counsel's statement of the case may be treated as binding, it is stated in 9 *Wigmore on Evidence* (3rd Ed.) § 2594 that "It is of the nature of an admission, plainly, that it be by intention an act of waiver, relating to an opponent's proof of the fact, and not merely a statement of assertion or concession, made for some independent purpose." 7 C.J.S. § 100 b (1937), which the Court quoted in *McLhinney*, continues:

"During the pendency of a cause the implied power of an attorney ordinarily extends only to admissions or statements which are distinctly and formally made in open court for the purpose of dispensing with formal proof of a fact at the trial, and are relevant to the issues involved in the particular cause in which the attorney is employed."

*Oscanyan v. Arms Co., supra,* cited by the Court in

---

11. The Court said in *Vernon* at 167: "As was held in *McLhinney*, there certainly may be situations in which litigants are bound by the action of their attorney and his acts in the trial of a case may be taken as amounting to waiver on behalf of his client of presentation of certain evidence."

*McLhinney*, finding that "[t]he power of the court to act in the disposition of a trial upon facts conceded by counsel is plain as its power to act upon the evidence produced," said that "[t]he question in either case must be whether the facts upon which it is called to instruct the jury be clearly established. If a doubt exists as to the statement of counsel, the court will withhold its directions, as where the evidence is conflicting, and leave the matter to the determination of the jury." 103 U. S. at 263. In *Bayer v. American Mutual Casualty Co., supra,* cited in *McLhinney,* the nature of a statement comprising an admission was discussed: "If an attorney in his opening statement makes a clear, unequivocal admission as to a fact, such admission is binding upon his client, but 'a mere statement or outline of anticipated proof upon any one or more of the issues in the case is not to be regarded as a binding admission so as either to conclude the party whose counsel made the statement or to dispense with the necessity of proof upon the issue on the part of his adversary.' " 359 S.W.2d, at 753.[12] In the other two cases cited in *McLhinney* the admissions were clear and unequivocal. In *Clark & Wilson Lumber Co. v. McAllister, supra,* a preliminary question was whether shares of stock were misappropriated or whether the challenged transfers were in any respect wrongful or improper. The court said, 101 F. 2d, at 713: "It is true no witness so testified, but defendant's counsel at the hearing before the referee made an opening statement which cannot be read otherwise than as a concession that the transfers to those persons were in fact misappropriations . . . ." In *The People v. Hill Top Mining Co., supra,* at the trial, after the People had

---

12. The court said in *Bayer*, at 753:

"We are convinced that the statement in question may not be regarded as a binding admission that the company was insolvent at the time plaintiffs made the investment. In his preliminary remarks [counsel] stated that he was just telling the jury what he thought the evidence would disclose. He then outlined what he thought the evidence would show as to the reason plaintiffs invested money in the company. He was undoubtedly correct in stating that it was to 'build up its assets.' Under the circumstances, the fact that he added the phrase, 'to make the company solvent,' will not be construed as an admission that it was insolvent."

introduced their evidence and after counsel for the plaintiff in error had introduced the evidence of a witness, his counsel stated to the court and for the information of counsel for the state a considerable portion of the facts. The statement was incorporated in the record and counsel made that same statement a part of his statement of facts to the appellate court. In *McLhinney* itself the admissions in the opening statement were patently so clear and unequivocal as to remove from the matters in controversy the issues of the alleged driver's involvement in the accident and the ownership of the vehicle he was driving. 254 Md. at 9-12. The record extract contains the opening statement in which the admissions were made, and without doubt, as the Court found, they were admissions and not merely a recital of facts which counsel expected to prove. See Briefs, No. 274, September Term 1968 as bound in volume 533, Court of Appeals of Maryland.

*The Instant Case*

(1)

We find no statements in the opening remarks by counsel for the Hospital which could be considered as an admission that there was a direct causal connection between the breach of the requisite standard of skill or care and the injury complained of. He made the purpose of an opening statement clear:

> "First of all, let me state to you the purpose of an opening statement. An opening statement is nothing more than the attorney's game plan. This is what he plans to prove during the course of the trial, and this is my time and I am telling you what we intend to prove during the course of this trial.
> This is not evidence. The evidence that you are to consider is the evidence that you will hear from the witnesses who will be in the witness chair and from the various items which will be admitted into evidence."

He told the jury they must answer two questions: (1) was the

Hospital negligent — "that is, did their care not meet the standard required of them", and (2) "did this cause the injury to Mrs. Raitt." He said the Hospital would adduce evidence that it did not violate the standard of care required of them in Maryland. "They met the standard of care; they were not negligent."

We hold that the trial court did not err in granting the Hospital's motion for a directed verdict for the reason that appellants did not establish a direct causal connection between any want of requisite skill and care on the part of the Hospital and the injury to Mrs. Raitt.

(2)

We reach the same conclusion with respect to the opening statement of counsel for Dr. Montague, which is set out in the appendix hereto. It may be that what he said could be deemed an admission that Mrs. Raitt's bowel was burned in the performance of the laparoscopic tubal ligation, but we see no statement sufficient to waive the necessity of appellants' proving that severe peritonitis resulted therefrom or that pulmonary emboli were caused thereby. Thus the direct causal connection between the negligence of the physician, assuming *arguendo* that he was negligent,[13] and the injuries complained of, was not shown.

We hold that the trial court did not err in granting Dr. Montague's motion for a directed verdict.

*Judgments affirmed; costs to be paid by appellants.*

APPENDIX

"MR. KING [Dr. Montague's Attorney]: May it

---

13. In the opening statement counsel for Dr. Montague expressly declared that the physician was not negligent — "the fact that this lady suffered a burn to her bowel is not evidence of negligence; it is not evidence of malpractice on the part of Dr. Montague or on the part of the Hospital." He also said ". . . this complication may occur as it did in this case in the presence of due care on the part of Dr. Montague." And he indicated that he would produce evidence to show that Mrs. Raitt did not suffer "any pulmonary emboli as a result of this occurrence."

please Your Honor, Mr. Foreman and members of the jury, you have been very patient as we have tried to get 12 people together here in this case, which is not an unimportant case. I want to thank you in advance for what I know will be your attention to some very interesting testimony about the performance of a procedure which is to bring about the sterilization of the patient and also about the treatment of a complication which ensues as a result of the doing of that sterilization procedure.

These are difficult cases I think for jurors to listen to fairly and impartially because you start with a patient or with a Plaintiff who has been injured, and I ask you to keep in mind and to keep an open mind until you have the charge of the law in this case by which we are all bound, and that is that the mere occurrence of an accident or, in this case, the fact that this lady suffered a burn to her bowel is not evidence of negligence; it is not evidence of malpractice on the part of Dr. Montague or on the part of the Hospital. That is going to be difficult for you to keep in mind and to keep an open mind about as you hear this testimony because, and no one will deny this, Mrs. Raitt, when she was admitted to the Hospital, was, indeed, a very severely sick woman and required, and, we submit, received fantastic care.

Dr. Montague, as the Court will charge you at the close of this case, is not an insurer or a guarantor of the safety of his patient.

MR. ELLIN [Appellants' Attorney]: I object. This is argument and I wasn't permitted to do that.

THE COURT: I think you are arguing your case, Mr. King.

MR. KING: Yes, sir.

Well, at the time Mrs. Raitt — and this was what I was coming to — came in initially to see Dr. Montague she was then a lady who was approaching her change of life, and because she was

having a difficulty in her menstrual period and was never sure of herself with respect to that event occurring and because she did not, apparently, wish to pursue other means of contraception Dr. Montague will tell you she sought specifically this operation.

When I say she sought this operation, this would have been in April of 1972 when Dr. Montague first saw her, she then described the operation as she wants what was referred to as the band-aid operation.

Dr. Montague as of April of 1972 had done some 500 of these procedures without any injury to the gastrointestinal tract, to the bowel, but when Mrs. Raitt asked him about the procedure and he said, 'Well, shall I tell you about it? ', she said, 'No. I just want that done, I just want that procedure done.'

So, he arranged then to have her admitted in May, as was done on the 15th, for the doing of this procedure.

Now, at the time the practice in Baltimore City, and the standard of practice is that which prevails in Baltimore City, in the community in which Dr. Montague has practiced, is that a patient who elects to have this procedure done is admitted, the procedure is done, the observation takes place for some period of four hours and after which, if there are no changes, substantial changes or remarkable changes in vital signs the patient is discharged from the hospital and thereafter followed by the physician in his office in the absence of complications. The testimony from Dr. Montague and others will indicate that the way this procedure is done, as Mr. Ellin has described it, is to make just one little incision which really requires to close it only two small sutures. That is why it gets the name band-aid operation, you literally go home with a band-aid on your belly. It is just below the umbilicus, the belly button.

Then through the introduction of gas the walls of the peritoneum are distended, blown up, so that when this laparoscope is introduced the surgeon, looking right through it, can visualize the fallopian tubes, which carry the egg from the ovary to the uterus, and those tubes are ultimately seen. This is direct. With the assistance of this instrument, it is therefore a direct visualization type of procedure, seeing those tubes.

An instrument is then introduced through the scope and the tubes are traced to their ultimate ends to be sure that you are dealing with the fallopian tube and no other structure, and then each tube is grasped by the little end of the instrument that is introduced through the scope and by a foot actuation — when the surgeon is certain that he is; No. 1, dealing with the fallopian tube; and, No. 2, it is within the area that he wishes to burn to interrupt its course, he then activates the current with his foot pedal and then releases it and removes the scope and goes to the other tube and does the same thing.

Now, what we have discovered, what is being found out about this procedure, and it is found when many electrical instruments are used to do many procedures — Dr. Wheelus, who developed this very technic, will appear as a witness on behalf of Dr. Montague and will explain to you how it is done, and he will further explain to you, as will Dr. Montague, that for some reason when this procedure is done, say, within a thousand cases there will appear, there will occur an injury to the bowel of, say, one of those persons in a thousand cases.

Now, that injury to the bowel, and in this case the injury to this lady's bowel, was at a point — the bowel moves, there is a peristalsis, the bowels move — mine may be moving now a little more actively than yours because of what I am doing, although it

shouldn't be — but this organ moves within the body cavity, a good healthy bowel will do that. At the point where this bowel was burned it would have been totally removed from the area where the little electrical ends of the instrument which brings about the cauterization of those tubes was brought to bear.

The question which you will be asking yourself as this evidence is produced is, how could that area of the bowel become burned when the electrification and the burning instrument is so far removed from the point which is intended to be affected by the operation?

* * *

Dr. Montague will state to you that while the injury, and this is in his answers to interrogatories which were referred to to be introduced in evidence, and I anticipate it will be, it states, in effect, that the injury while a rare complication is probably due to electrical current being carried to the bowel by an undiscernible filamentous mucus thread or some other unknown conductor.

The fact is that when you hear the testimony of this case, I will submit, from the experts and particularly from the very physician who devised the procedure and developed the operation the testimony is that this occurs, this complication may occur as it did in this case in the presence of due care on the part of Dr. Montague. That is going to be difficult for you to accept because, as I have said, the event which we recognize now as a complication which will occur did, in fact, occur in this case in the presence of due care.

When the procedure was finished, Mrs. Raitt with all other patients, and they have now done thousands of these procedures, not only in Baltimore City but, I think, indeed, in Montgomery County and elsewhere in the State of Maryland, she

was taken, as is the practice, to the recovery room and she was up there under the supervision of the nurses.

Dr. Montague will tell you he was in the Hospital that day. He didn't receive any summons and he didn't suggest that he should have received any summons to come and see Mrs. Raitt.

He also had another patient with respect to whom he had done the same procedure that day in the same recovery room and later that afternoon, the procedure being done sometime after 12:00 o'clock, Dr. Montague went to the recovery room to see if Mrs. Raitt was still there or if she had gone home. Indeed, he found that the nurses had discharged her to her home.

He observed her chart. Her chart will be in evidence, or a photostatic copy of the chart will be in evidence, and it is disclosed, indeed, her vital signs were normal and that she was not then giving any complaints which were other than the customary and usual ones which follow this procedure.

The testimony from Dr. Montague and Dr. Wheelus, who is world renown in having developed this procedure, he is a young man but literally world renown, he has gone all over the world to demonstrate the way in which this procedure was done, will be that she was kept at the Hospital for an accepted period of time to make the observations essential for her best interests and in keeping with the accepted standards of practice.

When Mrs. Raitt developed these complications, the testimony will further be, she developed them a lot sooner than they have been demonstrated by other cases in which this complication has occurred. The usual period of complications being seen, being diagnosed is some 48 to 72 hours after the procedure was done.

Mrs. Raitt the very next day called Dr. Montague,

and because we were at that time in a period when there was, indeed, a good deal of virus going on and because Dr. Montague had never before this time, having done some 500 of these procedures, had this complication occur before or since, I might say, and he has done some 300 since this operation, thought with a woman complaining of vomiting, which is not an unusual thing after general anesthesia, and complaining of some running of a temperature, that she was having a combination viral sort of infection and vomiting from the anesthesia which she had.

So he prescribed some Compazine and said, 'Call me if you don't get better.', and, indeed, that same day, as Mr. Ellin tells you, he did receive another call from her and directed her to go promptly to the emergency room at Johns Hopkins.

When he received that call he spoke to the resident and intern at Johns Hopkins at the emergency room indicating that he had a patient coming there, indicating that it was a patient on whom yesterday he had done this tubal ligation, but it is a band-aid operation and to please go over her carefully to see if there were any complications attendant to the doing of that procedure.

So, without any delay Dr. Montague will tell you they did, indeed, work her over, do the electrolytes, do the chemistry studies and did, indeed, get her set up and posted and as soon as an operating room was open and available for the exploratory operation called a laparotomy she was that very day, that evening about 10:30 taken to the first available operating room and her belly was laid open to see what, if anything, was occurring there causing her these by this time very severe symptoms and complaints.

When the abdomen was opened there was seen the burn in the bowel which was caused in the performance of that procedure. Some seven

centimeters of it were removed and the bowel re-anastomosed, put back end-to-end again, and because she had by this time had obvious peritonitis Dr. Montague — this Dr. Montague to whom I am referring now is Dr. Andrew Montague, Dr. Andrew Montague is the twin brother of the defendant doctor — I am saying 'Andrew', I mean Albert — he is the general surgeon, he is the twin brother of the defendant, Andrew Montague who was called and asked to do this procedure, employed because of the severe peritonitis, the inflammation of the peritoneum, the inflammation of the bowel into the peritoneal cavity and the presence of this infection which was a very serious infection and in keeping with the then extremely advanced modern way in which to treat this kind of infection did not close the abdomen. You don't just suture it up.

Dr. Montague will explain to you we learned in Vietnam in treating dirty wounds you don't close them up again because that causes abscessing and the thing we want to guard against, so her abdomen was left open and treated in this very advanced way so as to reduce the possibility that she may develop an abscess.

Now, that is not an insignificant matter because the second contention made by Mrs. Raitt, here, through her experts' is that she should have immediately been placed on this Heparin, this drug to reduce the chance that she would begin to clot and throw clots to her lungs and develop this kind of complication.

The judgment making that goes into that decision you will hear from Dr. Bell, who is the physician at Hopkins most knowledgeable and holds a professorship there, about the use of Heparin and about the application of this drug that the decision is most difficult as to when if ever, to go to the use of Heparin after surgery because of the risks of

using the drug as distinct from the benefits to be achieved if, indeed, the patient is clotting and going to throw an embolism and suffer that kind of complication.

So, when the order was given to do Heparin right away when the lady's prothrombin time that day — the prothrombin time is that time which is a measure of time during which blood will or will not clot and so you take prothrombin time to see what this lady's clotting time was immediately postoperative and when you found that her clotting time immediately postoperative was already in the anticoagulating condition the judgment was made not to go to Heparin, and that, we submit, is in good keeping with accepted standards, is good medical practice because of the dangers attendant to using Heparin had it at that time been employed.

You will see that it wasn't for some number of days after the operation, Mrs. Raitt being severely ill, no question about it, that the judgment was then being made purposefully not to use Heparin, and Heparin was not employed, indeed, until a number of days afterward.

Then the testimony from Dr. Bell will tell you that it was then used only empirically, it wasn't used, Dr. Bell will tell you, in the presence of positive indications that Heparin should be used, but only used empirically in the sense that, well, now she has gone sufficiently after the operation, the balancing of the risks as to go to it or not to go to it tended to favor the use of Heparin and it was then begun to be employed.

Indeed, whether or not Mrs. Raitt has had any pulmonary emboli is a question which you will have to resolve based on the testimony of Dr. Rodman on the one hand, who will be called by Mr. Ellin — Dr. Rodman, a professor, if you will, of Temple University, but, I think you will find more of a professional witness than anything else, having

appeared and testified a number of times in these cases on behalf of Mr. Ellin — as opposed to the testimony of Dr. Goldstein, who Mr. Ehrmantraut and Mr. Donovan have had look at this lady, as well as Dr. Summer, if I must call him because he will in a way be cumulative of what Dr. Goldstein did.

Dr. Goldstein, who is a pulmonary physician in Baltimore working at Good Samaritan Hospital ran tests on this lady and says he is unable to find any evidence —

MR. ELLIN: Unless he is going to call Dr. Summer I object to his stating this.

THE COURT: I agree. You are supposed to tell us what your witnesses will testify to.

MR. KING: All right, I anticipate Dr. Goldstein will say and, well, now Dr. Summer may be cumulative and the Court may rule —

MR. ELLIN: He is not cumulative.

MR. KING: If you are not going to make the objection I will call Dr. Summer.

MR. ELLIN: I will not object.

MR. KING: And if I do call Dr. Summer he will testify, if Your Honor please, that he is unable to find any satisfactory evidence that Mrs. Raitt has, indeed, suffered any pulmonary emboli as a result of this occurrence. So you will have before you that question; indeed, has she suffered this incident or, indeed, has her suffering of this incident been avoided by the prudent and judicious application of Heparin pursuant to her course of treatment at Johns Hopkins?

I will ask you, based on the findings of Dr. Goldstein and Dr. Summer, to conclude that, really, Mrs. Raitt, in spite of what was, indeed, a very, very stormy course at Johns Hopkins, now has essentially no permanent disability except, of course, permanent sterilization, which she sought as a result of this procedure.

In closing, if I may, this will be a long case and I ask you as you listen to the testimony to please, as I know you will, keep an open mind until all of the evidence has been produced, the defendants are constrained to say this because we come last and I particularly come last because first Mr. Ellin, then the Hospital and not until finally the very end will I have an opportunity, if I deem it necessary, to produce any evidence, and at the close of the case, based on the quality, the quality of the evidence produced on behalf of Dr. Montague, indeed, as well as the Hospital I will most respectfully ask, in what will be a very difficult case for you, to return a verdict on behalf of Dr. Montague as well as the Hospital.

Thank you, very much."